**Jane DOE, Appellant,**

v.

**UNITED STATES DEPARTMENT OF JUSTICE, et al.**

No. 84–5006.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 20, 1984.

Decided Feb. 1, 1985.

As Amended Feb. 4 & March 1, 1985.

W.W. Sleater, Clayton, Mo., for appellant, with whom Jane Doe was on the brief.

Thomas Millet, Atty., Dept. of Justice, Washington, D.C., with whom Richard K. Willard, Acting Asst. Atty. Gen., Dept. of Justice, Joseph E. diGenova, U.S. Atty., and Paul Blankenstein, Atty., Dept. of Justice, Washington, D.C., were on the brief, for appellee.

Before WRIGHT and WALD, Circuit Judges, and MacKINNON, Senior Circuit Judges.

Opinion for the Court as to Parts I–IV.A & V filed by Circuit Judge WALD.

Opinion for the Court as to Part IV.B filed by Circuit Judge J. SKELLY WRIGHT.

Opinion dissenting as to Part IV.B filed by Circuit Judge WALD.

Opinion dissenting in part and concurring in part filed by Senior Circuit Judge Mac-KINNON.

WALD, Circuit Judge:

This appeal involves an action brought by a former Department of Justice ("DOJ" or "Department") attorney against the Department and various DOJ officials in their individual and official capacities. On May 26, 1981, the plaintiff, proceeding in this case under the fictitious name of Jane Doe, was discharged from her position as a DOJ attorney amidst charges of unprofessional conduct and dishonesty. After unsuccessfully petitioning the government for a hearing on these allegations, Doe brought suit in district court, claiming that her termination violated Department regulations and that it deprived her of a constitutionally protected liberty interest without due process. The plaintiff also sued several Department officials, in their individual and official capacities, for infringing her liberty interest in reputation without due process. Doe sought reinstatement, back pay and other appropriate relief from the Department; she sought damages from the individual defendants.

Pursuant to the Department's motion under Rule 12 of the Federal Rules of Civil Procedure,[1] the district court dismissed the entire complaint for failure to state a claim upon which relief could be granted. *See Doe v. United States Dep't of Justice,* Civ. No. 83–1499 (Oct. 31, 1983) [hereinafter cited as *"Opinion"*]. Specifically, the district court ruled that the claim against the individual defendants was barred by the relevant statute of limitations, that the Department had not violated any mandatory internal regulations, and that Doe's liberty interest claim against the DOJ must be dismissed for failure to seek the proper remedy. On appeal, Doe challenges each of these rulings. We now affirm the district court's dismissal of Doe's claims against the Department based on internal DOJ regulations. *See infra* Part II. The

---

**1.** The district court did *not* treat the Department's Rule 12 motion as a motion for summary judgment under Rule 56. Rule 12 provides that if "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56...." The court did have before it materials outside the complaint, namely several affidavits concerning the events in dispute. *See infra* p. 1097. The affidavits, however, were attached to the Department's motion to dismiss, a motion filed in lieu of responsive pleadings. Moreover, before treating the Department's Rule 12 motion as a motion for summary judgment, the district court would have been required to allow the plaintiff an opportunity to prevent opposing evidentiary material. *See* Fed.R.Civ.P. 12(b) (noting that, if a Rule 12 motion is converted into a summary judgment proceeding, "all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."); *see also Gordon v. National Youth Work Alliance,* 675 F.2d 356, 360 (D.C.Cir.1982); *Gould Inc. v. Chafee,* 450 F.2d 667, 669 (D.C.Cir. 1971). The record in this case does not indicate that the district court gave the plaintiff any such notice and opportunity to present relevant material. We therefore treat the district court's disposition as a Rule 12(b) dismissal for failure to state a claim upon which relief can be granted, a dismissal confined to the legal sufficiency of the plaintiff's pleadings. *See Carducci v. Regan,* 714 F.2d 171, 176 n. 6 (D.C.Cir.1983).

panel (Judges Wright and MacKinnon) also affirms the district court's dismissal of Doe's damage action against the individual defendants. *See infra* Part IV. We conclude, however, that Doe's liberty interest claim against the Department states a cause of action upon which relief can be granted and that a genuine issue of material fact remains with respect to that claim. *See infra* Part III. We therefore vacate the district court's dismissal of Doe's liberty interest claim against the DOJ and remand for further proceedings consistent with this opinion.

## I. THE BACKGROUND

From 1974 until her discharge, Doe worked as an attorney in the Lands and Natural Resources Division of the Department. In 1978, she was assigned to the Indian Resources Section of that Division and placed under the supervision of defendants Myles Flint and Rembert Gaddy. In September of 1980, she was chosen to head up a major water rights lawsuit in Cheyenne, Wyoming. On March 18, 1981, Doe received a phone call from Flint's secretary requesting that she attend a meeting at his Washington office in five days. The plaintiff claims that she asked Gaddy and Flint about the subject of the meeting and was told to expect a routine briefing on pending cases. *See* Plaintiff's Complaint ¶ 13, Joint Appendix ("J.A.") at 5. At the March 24th meeting, however, Flint charged that Doe had become "loud and disorderly" and had "lost control" of herself in a discussion with another Department attorney involved in the Wyoming litigation.[2] He also alleged that, several months earlier, she had consumed beer during a deposition and had encouraged others, including the deponent, to drink. Doe flatly denied both charges and complained that she had not been given

the opportunity to review her notes concerning the events in question. *Id.* ¶ 16, J.A. at 6.

Approximately one hour later, the plaintiff was summoned to a second meeting with Gaddy, Flint and defendant Anthony Liotta, Acting Assistant Attorney General of the Lands and Natural Resources Division. At that meeting, Flint reiterated the allegations of unprofessional conduct, and Doe again denied the charges. Liotta stated that the Department would have to investigate the allegations and he directed Flint to establish procedures for obtaining statements from those present at the events in question. *Id.* ¶¶ 17–18, J.A. at 6–7. The plaintiff was also informed at the meeting that defendant Tom Echohawk, a junior attorney assisting Doe in the Wyoming litigation, had provided the initial information to Gaddy.

Flint undertook a further investigation of the two charges over the next few days.[3] *See* Affidavit of Myles E. Flint at ¶¶ 15–17, J.A. 31–33. According to Flint, some of the people he contacted confirmed, at least in part, the allegations, *see id.* (describing conversations with Echohawk and a government expert witness involved in the Wyoming litigation); others, according to the plaintiff, told Flint that the charges were untrue. *See* Plaintiff's Complaint ¶ 19, J.A. at 7. On March 27, 1981, the Department removed Doe as the head counsel for the Wyoming litigation and reassigned her to Washington pending the outcome of the investigation. *Id.* ¶ 20, J.A. at 7–8. Immediately after the reassignment, several attorneys involved in the Wyoming litigation urged Flint, Gaddy and Liotta to retain Doe on the case, asserting that Doe had not done anything that had interfered with the case or that had ham-

---

**2.** In particular, Flint said he had been informed that Doe had been disorderly, loud and possibly drunk during a discussion with another DOJ attorney about litigation strategy in the Wyoming case. The alleged argument began in a motel room in the presence of a DOJ expert witness and a tribal chairman, and continued in a public restaurant in the presence of an opposi-

tion witness. *See* Plaintiff's Complaint ¶ 15, J.A. at 6.

**3.** Flint conducted the bulk of his investigation on March 16th and 17th, well before the March 24th meeting. *See* Affidavit of Myles L. Flint ¶¶ 2–10, J.A. at 25–29 (discussing phone conversations, initiated by Flint, with two individuals present at the events in dispute).

pered the Department's interests. *See* Affidavit of Myles E. Flint ¶ 15, J.A. at 32; Affidavit of Anthony C. Liotta ¶ 5, J.A. at 20–21; *see also* Plaintiff's Complaint ¶ 21, J.A. at 8. According to Gaddy, however, at least one of the attorneys indicated that Doe had indeed used "bad judgment" in the two incidents at issue. *See* Affidavit of Rembert A. Gaddy, ¶ 7, J.A. at 37–38.

No further action was taken until Doe was summoned to a meeting with Flint and Gaddy on May 14, 1981. At that meeting, Flint informed her that the "investigation" was complete and confronted her with affidavits concerning the incidents in question from Liotta, Flint, Gaddy, Echohawk and an expert witness Flint had contacted at the suggestion of Echohawk. Plaintiff's Complaint ¶ 22, J.A. at 8–9. Flint then demanded the plaintiff's resignation by May 15 and indicated that, if she refused to resign, she would be terminated and the affidavits placed in her personnel file. *Id.* Flint also suggested that the investigation and eventual termination decision had been approved by defendant Edward Schmults, Deputy Attorney General. *Id.* On May 15, Doe requested a three day extension for the resignation decision from Assistant Attorney General Carol Dinkins, also a defendant in this case. Dinkins granted the extension but declined to discuss the merits of the allegations. *Id.* ¶ 23, J.A. at 9. On May 18, Doe, through her attorney, refused to resign and formally requested a hearing at which she could confront her accusers and present evidence that the charges were untrue. *Id.* ¶ 24, J.A. at 9; *see also* Appellant's Appendix at Exhibit A (letter from plaintiff's attorney to Schmults denying charges and requesting a hearing).

On May 26, 1981, the hearing request was denied and Doe received a formal memorandum of termination. *See* Memorandum from Edward Schmults to Jane Doe (May 26, 1981), J.A. at 47–48. The memorandum reiterated the original charges and stated that Doe's actions violated the Department's Standards of Conduct, *see* 28 C.F.R. Part 45 (1984), and the Canons of Ethics of the American Bar Association. The memorandum also stated that "[t]he adverse effect of your conduct on the Department is aggravated ... because you lied to your [immediate supervisors] by denying that these incidents occurred. Later you also lied to the Acting Assistant Attorney General by denying the same incidents." Memorandum from Edward Schmults to Jane Doe 2 (May 26, 1981), J.A. at 48.

On June 15, 1981, Doe appealed her termination to the Merit Systems Protection Board (MSPB), requesting, among other things, a hearing concerning the circumstances leading to her removal. The Department actively opposed this appeal, arguing that the MSPB lacked jurisdiction to hear Doe's case because she was a member of the excepted civil service.[4] *See* Reply Brief for the Appellant at Exhibit C (the Department's motion to dismiss Doe's MSPB appeal). An MSPB examiner agreed with the Department and dismissed the appeal for want of jurisdiction, *see Jane Doe v. Department of Justice,* No. 0607528110628 (July 30, 1981), and the full MSPB later upheld the examiner's dismissal. The plaintiff simultaneously sought redress from the Office of the Special Counsel; on December 8, 1981, that office also declined to investigate the circumstances leading to the termination. *See* Appellant's Supplemental Appendix (letter from Special Counsel's office declining to investigate Doe's termination).

Doe, proceeding *pro se,* subsequently filed a complaint in district court alleging that her discharge violated Department regulations and that the termination and surrounding allegations of unprofessionalism and dishonesty infringed her fifth

**4.** *See* 5 C.F.R. § 6.1 (1984). An excepted civil servant is not afforded the substantive and procedural protections prescribed by the Civil Service Reform Act of 1978 (CSRA), Pub.L. No. 95–954, 92 Stat. 1111 (codified as amended in scattered sections of 5 U.S.C.). In particular, non-veteran employees in the excepted civil service are not protected by the "removal for cause" or "removal for unacceptable performance" provisions of CSRA and cannot appeal adverse employment decisions to the MSPB. *See* 5 U.S.C. §§ 4303(e), 7511(a)(1).

amendment liberty interest in reputation without due process. She also sued the Department supervisors involved in her discharge, in their individual and official capacities, alleging that they had deprived her of liberty without due process by repeating the allegations to other water rights lawyers. *See* Plaintiff's Complaint ¶ 28, J.A. at 12. She claimed that the Department's action and the subsequent spreading of the charges by DOJ officials had foreclosed future employment opportunities in her preferred field and had "destroyed her reputation as a competent and capable attorney and as a sober and serious person." *Id.* She sought reinstatement and back pay from the Department, and *Bivens* -type [5] damages from the individual defendants.

The district court dismissed the entire complaint in a brief memorandum opinion. The court first ruled that the analogous one-year statute of limitations for defamation in the District of Columbia, D.C.Code § 12–301(4), should be applied to the claims against the individual defendants. Construing the complaint to allege constitutional defamation on the date of her removal from the Department, nearly two years before the suit was brought, the court ruled that the claims against the individual defendants were barred by the statute of limitations. *See Opinion* at 2–3. The district court then held that the DOJ regulations cited by the plaintiff provided her with no procedural protections and that Doe was not denied due process in the actual *termination* decision. *See id.* at 4–5. The court never ruled on whether the plaintiff had alleged a reputational interest protected by the fifth amendment or whether she was given the process required to protect any such liberty interest. Instead, the district court reasoned that the liberty interest claim against the Department "must fail as a matter of law" because Doe did not request the appropriate relief against the Department, namely a hearing to clear her name. *See id.* at 5.

We affirm the district court's ruling that the discharge itself did not violate any internal DOJ regulations and that the plaintiff was not entitled to pre-termination process. The record before us with respect to the remaining claims is sparse because Doe's complaint was dismissed before any discovery was taken. From a careful examination of the pleadings and the various motions filed in the trial court, however, we conclude that the district judge erred in dismissing Doe's liberty interest claim against the Department. Finally, the panel concludes that the district court properly interposed the local one-year statute of limitations as a bar to Doe's *Bivens* action against the individual defendants.

## II. THE CLAIMS BASED ON DEPARTMENT REGULATIONS

■ The plaintiff contends that the charges brought against her should have been referred to the Office of Professional Responsibility (OPR), the Employee Assistance Program (EAP), or both, pursuant to internal DOJ regulations. Both sets of guidelines cited by the plaintiff establish special procedures for dealing with particular kinds of employee problems and misconduct. Courts, of course, have long required agencies to abide by internal, procedural regulations concerning the dismissal of employees even when those regulations provide more protection than the Constitution or relevant civil service laws. *See, e.g., Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957). The guidelines involved in those cases, however, explicitly required agencies to follow elaborate and mandatory pre-termination procedures.

---

**5.** *See Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (allowing the recovery of damages for fourth amendment violations by federal officials acting in their official capacity); *see also Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980) (same under the eighth amendment); *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (fifth amendment); *Dellums v. Powell,* 566 F.2d 167 (D.C.Cir.1977) (first amendment), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978).

The regulation at issue in *Vitarelli*, for example, required 30 days notice of a proposed discharge, a written statement of the asserted grounds for termination, and a formal, trial-type hearing before a specially constituted hearing board. *See Vitarelli*, 359 U.S. at 540–46, 79 S.Ct. at 973–76; *see also Service*, 354 U.S. at 373–76, 77 S.Ct. at 1157–59. In sharp contrast, neither the OPR nor the EAP regulations involved in this case create any explicit or formal procedural protection for employees, and neither operates as a mandatory constraint on the Department's actions.

The EAP was established to encourage Department employees with chronic drug, alcohol or emotional problems to seek professional help. *See* DOJ Order No. 179.1 at 1–2 (May 15, 1978), J.A. at 53–54. The implementing guidelines provide that employees with alcohol or drug related problems are encouraged to seek EAP assistance to overcome their illness and to avoid adverse employment actions in the future. *See id.* Yet the guidelines themselves disavow any intent to provide job protection to employees whose work performance is suffering as a result of alcoholism or any other condition.

> This referral to assistance will in no way affect the processing of a disciplinary action for the employee's misconduct or criminal activities, including removal, if the nature of the offense and the nature of the employee's duties warrant that action.

*Id.* at 9, J.A. at 60. Moreover, as the district court observed, the plaintiff has consistently denied that she had or has any drinking problem; indeed the Department discharged Doe for alleged unprofessional conduct and dishonesty, not for alcoholism. Accordingly, she cannot rely on the EAP program to challenge her discharge. *See Spragg v. Campbell*, 466 F.Supp. 658 (D.S. D.1979) (upholding a federal employee's dismissal for alcohol related misconduct de-

spite the existence of a program similar to the EAP); *Allen Vyse*, 226 Ct.Cl. 683 (1981) (same).

The regulations creating the Department's OPR, 28 C.F.R. § 0.39 (1984), provide that the OPR shall "[r]eceive and review any information or allegation concerning conduct by a Department employee that may be in violation of law, regulations or orders, or of applicable standards of conduct...." *Id.* § 0.39a(a). They also provide that the OPR shall "make such preliminary inquiry as may be necessary" to determine whether a disciplinary matter should be referred from an employee's immediate supervisor to another DOJ official. *Id.* § 0.39a(c); *see also id.* § 0.39a(d)(3). The plaintiff contends that the Department violated this mandate because the OPR neither investigated her case nor reviewed the decision made by her direct supervisors.

Doe's reliance on these regulations, however, cannot withstand scrutiny. The OPR regulations explicitly state that the responsibility of investigating employee misconduct and of instituting adverse employment actions remains with the various unit heads within the Department.

> Primary responsibility for investigating an allegation of unprofessional conduct that is lodged against an employee of the Department normally shall continue to rest with the head of the office, division, bureau, or board to which the employee is assigned, or with the head of its internal inspection unit, or, if the conduct appears to constitute a violation of law, with the head of the agency having jurisdiction over the subject matter involved.

*Id.* §§ 0.39d(a), (b); *see also id.* § 0.39a(a) (stating that the OPR does not preempt the primary responsibility of internal inspection units within the Department). The regulations nowhere assert that the OPR has exclusive or even mandatory jurisdiction to investigate charges such as those involved in this case.[6] Nor do the regula-

---

6. The OPR regulations do provide certain mandatory procedural protections for "whistleblowers." *See* 28 C.F.R. § 4.39a(b) (1984). Doe does not, however, claim that she falls into this category. And while the regulations explicitly grant the OPR authority to stay personnel actions against FBI employees under certain circumstances, *see id.* § 0.39b, they contain no similar

tions grant employees any right to appeal disciplinary investigations or decisions to the OPR.

At best, then, the OPR is intended to supplement, not to supplant, existing investigative procedures. The OPR rules were not, in any event, adopted to provide procedural protections to DOJ employees. Rather, the rules were intended to benefit the Department as a whole by "establish[ing] procedures for the disclosure of information evidencing misconduct by Department employees...." 45 Fed.Reg. 27754 (April 24, 1980); *see* 28 C.F.R. § 0.39a(b) (1984). Although an agency is ordinarily bound by its own procedural rules, it is also within the agency's discretion to modify or waive those "rules not intended primarily to confer important procedural benefits upon individuals in the face of otherwise unfettered discretion." *American Farm Lines v. Black Ball Freight Service,* 397 U.S. 532, 538, 90 S.Ct. 1288, 1292, 25 L.Ed.2d 547 (1970). Moreover, even assuming that the OPR was required to act in this case, its sole function would have been to report the matter to a senior Department official. *See* 28 C.F.R. § 0.39a(a)(1) (1984). Flint's

investigation and Doe's actual discharge were in fact reviewed and approved by Deputy Attorney General Schmults, one of the "independent" senior officers identified for referral in the OPR regulations. *See id.* § 0.39a(d)(3).[7]

The district court therefore correctly held that neither the OPR regulations nor the EAP guidelines constrained the Department's ability to terminate Doe. And if the plaintiff cannot challenge her actual termination under Department regulations,[8] her claim for reinstatement must fail. Doe's back pay claim presents a somewhat more difficult problem. On the one hand, we believe that Doe cannot seek back pay if she cannot challenge her actual discharge. As a member of the excepted civil service, Doe enjoyed no statutory entitlement to her position with the Department; similarly, the Department was not procedurally constrained by the civil service laws or any other regulations in its actual decision to terminate Doe. If her claims based on the OPR and EAP guidelines fail, then, she cannot challenge her removal from the Department;[9] she cannot therefore claim any

---

grant regarding personnel actions against other Department employees.

7. The plaintiff cites a memorandum to Department supervisors from Attorney General William Smith stating that all allegations against DOJ employees "must immediately be brought to the attention of the Office of Professional Responsibility. That office will then either monitor the conduct of the investigation into those allegations, or, in appropriate situations, will participate in or direct those investigations." Memorandum from William French Smith to DOJ Office Heads, February 16, 1982, Appellant's Appendix at Exhibit B. As we read this memorandum, however, the Attorney General was concerned about misconduct that would otherwise go unreported and unremedied, not about the lack of procedural protections for DOJ employees. In any event, the memorandum does not create the explicit and highly formalized procedural protections that were decisive in *Service* and *Vitarelli.*

8. The complaint, liberally construed, might also be read to allege that the Department deprived Doe of a constitutionally protected property interest in her job without due process. *See* Plaintiff's Complaint ¶ 34, J.A. at 15. Apparently, Doe does not press this property interest claim on appeal. To the extent that she does, how-

ever, our conclusion that the Department did not violate any mandatory regulations forecloses any claim that the Department violated the property clause of the fifth amendment in its termination decision. As we have already noted, Doe did not enjoy the substantive and procedural protections provided members of the competitive civil service by the CSRA. *See supra* note 4. Accordingly, Doe cannot ground a property right to continued employment in "an independent source such as state [or federal] law," *Roth v. Board of Regents,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Similarly, because she had no right to invoke the OPR or EAP guidelines, she cannot point to the type of "mutually explicit understandings" that might also create constitutionally protected property rights in continued employment. *See Perry v. Sinderman,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972).

9. Doe's constitutional defamation claims, do not implicate the termination itself, but rather the damage to her reputation occasioned by the charges of unprofessionalism and dishonesty surrounding the discharge. *See Dennis v. S & S Consolidated Rural High School Dist.,* 577 F.2d 338, 344–45 (5th Cir.1978) (holding that reinstatement and back pay are inappropriate remedies to a constitutional defamation claim in the

right to continued compensation that would entitle her to relief under the Back Pay Act. *See* 5 U.S.C. § 5596(b)(1)(A); *Crimaldi v. United States,* 651 F.2d 151 (2d Cir. 1981).

■ Nonetheless, although no party has raised any question concerning the jurisdiction of this court to hear Doe's appeal, Judge MacKinnon's dissent does so now at the eleventh hour. Hence, we briefly consider and reject his challenge based on the Federal Courts Improvements Act of 1982, Pub.L. No. 97–164, 96 Stat. 25 (codified in scattered sections of 28 U.S.C.). That Act provides that the United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction over an appeal from a district court if the district court based its jurisdiction "in whole or in part" on 28 U.S.C. § 1346. *See* 28 U.S.C. § 1295(a)(2). Section 1346(a)(2), in turn, confers concurrent jurisdiction in district court and the Claims Court for civil actions against the United States based on the Constitution, acts of Congress or agency regulations for amounts not exceeding $10,000. *See* 28 U.S.C. § 1346(a)(2). Jurisdiction for those monetary claims against the United States exceeding $10,000 lies exclusively with the Claims Court. *See* 28 U.S.C. § 1491.

In this case, Doe appended a claim for back pay to her more central constitutional claims. Although Doe did not specify the precise amount of the back pay she sought, we conclude that her complaint should be read to seek more than $10,000 in back pay because Doe, a GS–14 attorney earning approximately $45,000 a year, was discharged over two years before she brought this lawsuit and alleges that she has not been able to secure comparable employment in her field. *See* Plaintiff's Complaint ¶¶ 12, 29, J.A. at 4, 12. Accordingly, it appears that the district court lacked jurisdiction over her back pay claim under 28 U.S.C. § 1346. The district court dismissed the entire reinstatement-related claim for fail-

ure to state a claim upon which relief could be granted. We are confident that this is precisely the route that the Claims Court and the Federal Circuit would have taken had Doe brought her back pay claim there. *See, e.g., Biagioli v. United States,* 2 Cl.Ct. 304 (1983); *cf. United States v. Connolly,* 716 F.2d 882, 886–88 (Fed.Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984). We therefore affirm the dismissal for jurisdictional reasons as well as those stated by the district court.

■ Although in another case, the district court's lack of jurisdiction over the back pay claim might present a question of whether it also lacked jurisdiction to hear the closely-related reinstatement claim, *see, e.g., Giordano v. Roudebush,* 617 F.2d 511, 514–15 (8th Cir.1980), we believe that it would confound common sense and judicial economy to address that complex issue at this juncture where the underlying claim for reinstatement so clearly lacks merit. We therefore invoke Supreme Court precedent which permits us, in exceptional cases, to defer the resolution of a difficult jurisdictional issue where the decision on the merits is clearly fore-ordained whatever the jurisdictional outcome. *See Secretary of Navy v. Avrech,* 418 U.S. 676, 94 S.Ct. 3039, 41 L.Ed.2d 1033 (1974) (per curiam); *cf. National Juvenile Law Center, Inc. v. Regnery,* 738 F.2d 455, 466–67 (D.C.Cir. 1984) (per curiam).

■ We also conclude that the back pay claim does not create any jurisdictional impediment to our review of Doe's more central constitutional claims. Section 1346, of course, would not under any circumstances deprive a district court of jurisdiction to consider Doe's *Bivens* action, which does not involve a claim against the United States, or her claim for equitable relief under the Constitution in the form of a name-clearing hearing. *See infra* pp. 1112–14. Those claims do not in any way

absence of an independent right to continued employment); *Harper v. Blumenthal,* 478

F.Supp. 176, 186–88 (D.D.C.1979) (same).

implicate reinstatement or back pay and they unquestionably fall within the district courts' general federal question jurisdiction. *See* 28 U.S.C. § 1331. Similarly, where the district court's jurisdiction could not have been based "in whole or in part" on 28 U.S.C. § 1346, *see* 28 U.S.C. § 1295(a)(2)—as it could not have been here—nothing in the Courts Improvements Act or its legislative history precludes this court from considering Doe's appeal of the remaining non-monetary claims. *See* S.Rep. No. 275, 97th Cong., 2d Sess. 19–20 (1982), U.S.Code Cong. & Admin.News 1982, pp. 11, 29–30 (noting that litigants should not be allowed to create or deny federal court jurisdiction through subsidiary claims and that federal courts must "ensure the integrity" of appellate jurisdiction under the act by separating substantial from frivolous claims). We therefore affirm the district court's dismissal of the reinstatement claim for failure to state a claim upon which relief can be granted and we affirm its implicit dismissal of the back pay claim for jurisdictional reasons as well as those relied upon by the district court.

## III. The Liberty Interest Claim Against The Department

 A motion to dismiss for failure to state a claim upon which relief can be granted is generally viewed with disfavor and rarely granted. *See* 2A Moore's Federal Practice § 12.08 (2d ed. 1948 & Supp. 1984). For the purposes of such a motion, the factual allegations of the complaint must be taken as true, and *any* ambiguities or doubts concerning the sufficiency of the claim must be resolved in favor of the pleader. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1979); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *Sinclair v. Kleindienst,* 711 F.2d 291, 293 (D.C.Cir.1983); *Riegle v. Federal Open Market Committee,* 656 F.2d 873, 877 (D.C.Cir.), *cert. denied,* 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 616 (1981); *Shear v. National Rifle Ass'n of America,* 606

F.2d 1251, 1253 (D.C.Cir.1979). In particular, "a complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his [or her] claim which would entitle him [or her] to relief." *Conley,* 355 U.S. at 45–46, 78 S.Ct. at 101–02; *see Hughes v. Rowe,* 449 U.S. 5, 10, 101 S.Ct. 173, 176, 66 L.Ed.2d 163 (1980).

The district court dismissed Doe's claim that the Department violated her fifth amendment interest in reputation for failure to state a claim solely on the ground that Doe did not seek the appropriate remedy. *See Opinion* at 1096–97. We now vacate this aspect of the district court's Rule 12 dismissal. We further hold that Doe's discharge amidst allegations of unprofessionalism implicates a constitutionally protected liberty interest in reputation and that, if those allegations were publicly disclosed, she is entitled to an opportunity to clear her name.

### A. The Limits on Rule 12 Dismissals

The district court did not reject Doe's version of the Department's actions which, she argues, deprived her of a liberty interest in reputation without due process. Instead, the court concluded that, if her professional reputation was stigmatized by the discharge, the well-settled remedy "mandated by the Due Process Clause of the [Fifth] Amendment is an 'opportunity to refute the charge.'" *Codd v. Velger,* 429 U.S. 624, 627, 97 S.Ct. 882, 884, 51 L.Ed.2d 92 (1977) (quoting *Board of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1971)); *see Opinion* at 5. This conclusion is unassailable. Doe's liberty interest implicates her post-employment reputation rather than any right to continued employment with the Department; if Doe can demonstrate that the DOJ harmed her professional standing without providing the proper procedural protections, her remedy is a "name-clearing" hearing. *See Codd,* 429 U.S. at 627,

97 S.Ct. at 884; *Roth,* 408 U.S. at 573, 92 S.Ct. at 2707; *Wehner v. Levi,* 562 F.2d 1276, 1279 (D.C.Cir.1977); *Campbell v. Pierce County,* 741 F.2d 1342, 1344 (11th Cir.1984); *In Re Selcraig,* 705 F.2d 789 (5th Cir.1983); *Dennis v. S & S Consolidated Rural High School Dist.,* 577 F.2d 338, 344 (5th Cir.1978) ("The purpose of the due process hearing to which [the plaintiff] was entitled was not to afford an opportunity to recapture his previous employment but simply to clear his name."); *Harper v. Blumenthal,* 478 F.Supp. 176, 177 (D.D.C. 1979).

■ Despite its apparent conclusion that Doe had alleged facts sufficient to entitle her to a *Codd* hearing, however, the district court dismissed the plaintiff's liberty interest claim against the Department.

> Plaintiff does not allege that she ever requested a hearing to clear her name and does not seek one by this complaint. Absent a denial of such a request no violation of due process can be demonstrated, *Arnett* [*v. Kennedy,* 416 U.S. 134,] 157 [94 S.Ct. 1633, 1645] [(1974)] (Rehnquist, J.), and plaintiff's complaint must fail as a matter of law.

*Opinion* at 6.[10] We find this statement an insufficient ground for dismissal for two reasons. First, the district court evidently concluded that Doe never requested a hearing to clear her name from the Department. The pleading discloses no basis for

this conclusion. Indeed, Doe's complaint explicitly states that she "requested a hearing and an opportunity to present favorable evidence [to Department officials] showing that the alleged incidents of misconduct were not true ...." Plaintiff's Complaint ¶ 24, J.A. at 19. Taken as a whole, moreover, the complaint certainly avers that the plaintiff sought, but was systematically denied, an opportunity to address the charges that resulted in her dismissal and stigmatized her professional reputation. The district court was obliged to accept these allegations as true for the purposes of a Rule 12(b)(6) motion.

■ Second, the district court assumed that the claim must be dismissed because Doe's complaint did not explicitly seek a name-clearing hearing. *See* Brief for Appellees at 30–31 (urging this interpretation of the district court's holding). Yet there can be little doubt that the thrust of Doe's complaint is that the Department's allegations and the discharge have damaged her professional reputation and that she has never been given an opportunity to refute the charges in any orderly way. Her complaint clearly indicates that she sought some kind of hearing from the Department, *see* Plaintiff's Complaint ¶¶ 24; 28, J.A. 9, 12, and her prayer for relief seeks "such other and further relief as the court may deem necessary and appropriate." Plaintiff's Prayer for Relief ¶ 3, J.A. at 16.

---

**10.** It is not clear how the district court's reference to *Arnett v. Kennedy* is relevant to this case. A majority of the Supreme Court explicitly rejected Justice Rehnquist's attempt in *Arnett* to bind the scope of constitutionally recognized *property* rights to the remedies available under statutory law. *See Arnett,* 416 U.S. at 209–11, 94 S.Ct. at 1671–72 (Marshall, J., dissenting); *Bishop v. Wood,* 426 U.S. 341, 345 n. 8, 96 S.Ct. 2074, 2078, n. 8, 48 L.Ed.2d 684 (1976); *Goss v. Lopez,* 419 U.S. 565, 586, 95 S.Ct. 729, 742, 42 L.Ed.2d 725 (1975) (Powell, J., dissenting). The federal employee involved in *Arnett* also alleged a liberty interest violation; yet he was a member of the competitive civil service and, as such, enjoyed mandatory substantive and procedural protections from adverse employment actions. *See Arnett,* 416 U.S. 139–48 & nn. 5–16, 94 S.Ct. at 1637–1641 & nn. 5–16. Those procedures included a post-termination, trial-type hearing which, the Court found, afforded the *Arnett*

plaintiff a chance to "clear his name." The plaintiff in this case enjoyed virtually no procedural protections under the civil service statute, *see supra* n. 4, and this circuit has held that meager statutory protections are inadequate to protect the type of liberty interest involved in this case. *See e.g., Old Dominion Dairy Products, Inc. v. Secretary of Defense,* 631 F.2d 953 (D.C.Cir.1980) (statutory debarment procedures inadequate to protect government contractor's reputational interests notwithstanding plaintiff's failure to make optimal use of those procedures). Moreover, the fact that government employees who enjoy a property interest in continued employment might have an adequate opportunity to challenge government defamation in the constitutional *remedy* required to protect their property interest does not affect the existence of an independent *right of action* under the liberty aspect of the due process clauses. *See infra* note 15.

Courts are traditionally encouraged to adjudicate the basic legal claim, even where the plaintiff has failed to seek the precisely correct relief but has instead relied on a general request for "other appropriate relief." *See e.g., Pickus v. United States Board of Parole,* 507 F.2d 1107, 1110 (D.C. Cir.1974); *cf.* Fed.R.Civ.P. 54(c) ("every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings.") The liberal reading of complaints required under Rule 12(b)(6) thus minimally requires that Doe be permitted to amend her complaint in order to seek a *Codd* hearing. *See generally* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1357 (1969 & Supp.1983) (collecting cases); 2A Moore's Federal Practice ¶ 12.08 (2d ed. 1948 & Supp.1984) (same).

■ Moreover, it need not appear that the plaintiff can obtain the *specific* relief demanded as long as the court can ascertain from the face of the complaint that *some* relief can be granted. *See* 5 Wright & Miller § 1357 at 602 & n. 77.

> When a motion to dismiss a complaint is made, ... the clear and long-accepted meaning [of Rules 54(c) and 12] is that a complaint should not be dismissed for legal insufficiency except where there is failure to state a claim on which *some* relief, not limited by the request in the complaint, can be granted.

*Norwalk CORE v. Norwalk Redevelopment Agency,* 395 F.2d 920, 926 (2d Cir. 1968) (footnote omitted) (emphasis in original); *see Kahan v. Rosenstiel,* 424 F.2d 161, 174 (3d Cir.), *cert. denied,* 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970); *Logan v. General Fireproofing Co.,* 521 F.2d 881, 884 n. 3 (4th Cir.1971); *Sapp v. Renfroe,* 511 F.2d 172, 176 n. 3 (5th Cir. 1975). A district court should not grant a Rule 12(b)(6) motion to dismiss for failure to seek the technically appropriate remedy when the availability of some relief is readily apparent on the face of the complaint.[11]

Here, the complaint and the motion for dismissal clearly demonstrated that Doe could prove a set of facts that would entitle her to some form of relief—namely a hearing to clear her name. The proper course of action at that point was to grant the plaintiff leave to amend her complaint in order to seek such a hearing or to read such a hearing request into the prayer for "other appropriate relief." We therefore vacate the district court's dismissal of Doe's reputational liberty interest claim against the Department for failure to seek the appropriate remedy.

### B. Doe's Liberty Interest in Reputation

■ By dismissing Doe's liberty interest claim against the Department on technical grounds, the district court avoided the prickly question of whether the DOJ's actions infringed Doe's constitutionally protected liberty interest in professional reputation. Taking the plaintiff's factual allegations as true, we now find that the stigmatizing nature of the Department's charges, her discharge, and the subsequent foreclosure of future employment opportunities, including government job opportuni-

---

**11.** In two recent cases, Chief Judge Robinson has cautioned against an overzealous use of Rule 12(b)(6) to dismiss complaints when plaintiffs are entitled to some relief, although not the precise relief demanded. *See Council for the Blind of Delaware County, Inc. v. Regan,* 709 F.2d 1521, 1534 (D.C.Cir.1983) (en banc) (Robinson, C.J., concurring in part and dissenting in part); *American Jewish Congress v. Vance,* 575 F.2d 939, 948 (D.C.Cir.1978) (Robinson, J., dissenting in part). His admonition in *American Jewish Congress* is especially relevant here.

> To be sure, appellants seek extensive and "extraordinary remedies," considerably more than could be justified as remediation for

injuries suffered at the level of exclusion that they have standing to challenge. But plaintiffs frequently ask for the stars, and a complaint is not dismissable simply because its proof would at most entitle the plaintiff to something less ... To throw out of court plaintiffs who want more than they are likely to get is to ignore human nature and to create an unrealistic and unwarranted barrier to litigation.

*American Jewish Congress,* 575 F.2d at 950–51 (footnotes omitted); *see Council for the Blind,* 709 F.2d at 1540–41 (arguing that some relief might be available to plaintiffs if a class could be certified).

ties, combined to deprive Doe of a constitutionally protected liberty interest in reputation without due process.[12]

The district court rightly noted that: A government employee's liberty interests are implicated where in terminating the employee the government "make[s] any charge against him that might seriously damage his standing and associations in the community" or "impose[s] on him a stigma or other disability that foreclose[s] his freedom to take advantage of other employment opportunities." Board of Regents v. Roth, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972).

Opinion at 5; see also Bishop v. Wood, 426 U.S. 341, 348–49, 96 S.Ct. 2074, 2079–80, 48 L.Ed.2d 684 (1967). In Roth, the Court ruled that the mere failure to rehire a non-tenured teacher did not carry such a stigma. But the Roth Court observed that an individual's liberty interest is impaired when the government acts to injure his or her good name, reputation, honor or integrity, or imposes a stigma that effectively forecloses his or her future employment opportunities. See Roth, 408 U.S. at 573, 92 S.Ct. at 2707. In Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), the Court went on to require some tangible alteration of a "status"—in addition to an injury to reputation—before a liberty interest will be recognized. We conclude that Doe states a claim under the fifth amendment because her discharge

from the Department and her effective loss of future government employment opportunities constitute the tangible alteration of a governmental status required by Paul, and the Department's charges of unprofessionalism and dishonesty impose the type of stigma recognized by Roth.

First, Doe does not present the "reputation alone" case precluded by Paul. In Paul, the plaintiff challenged the circulation by local police of a flyer describing "active shoplifters" bearing the plaintiff's name and picture. The Court held that the plaintiff's charge that the flyer had defamed him, "standing alone and apart from any other governmental action with respect to him," did not state a claim for relief under section 1983, see 42 U.S.C. § 1983, and the fourteenth amendment. See Paul, 424 U.S. at 694, 96 S.Ct. at 1157.[13] After reviewing its prior stigma jurisprudence, the Court rejected the position that every government defamation infringes a constitutionally recognized liberty interest:

In each of these cases, as a result of the state action complained of, a right or status previously recognized by state law was distinctly altered or extinguished. It was this alteration, officially removing the interest from the recognition and protection previously afforded by the State, which we found sufficient to invoke the procedural guarantees contained in the Due Process Clause of the Fourteenth Amendment. But the interest in reputa-

---

**12.** In his dissent, Judge MacKinnon states that we reach the liberty interest question "without ... the full benefit of our adversarial system of adjudication," because the issue "has been briefed and argued ... not as fully as it should be." Diss. Op. of MacKinnon, J., at p. 1131 n. 12. Plainly, however, the liberty interest question was briefed and vigorously argued before this court. See Brief for Appellant at 19–25; Brief for Appellees at 22–28; Reply Brief for Appellant at 7–13. If anything, the Department very nearly concedes that Doe is entitled to a Codd hearing. See Brief for Appellees at 21 ("[P]laintiff has available to her a constitutional [sic] adequate remedy—a remedy which she has not sought—of seeking a court order requiring the Justice Department to provide her with an administrative hearing at which she may have the opportunity to clear her name.").

**13.** The Supreme Court has consistently applied the same standards to determine deprivation of liberty without due process under the fifth and the fourteenth amendments. See Paul, 424 U.S. at 702 n. 3, 96 S.Ct. at 1161 n. 3. ("If ... defamation by a state official is actionable under the Fourteenth Amendment, it would of course follow that defamation by a federal official should likewise be actionable under the cognate Due Process Clause of the Fifth Amendment.") We simply do not comprehend how Judge MacKinnon can now assert that federal employees enjoy less constitutional protection than state employees. See Diss. Op. of MacKinnon, J., at pp. 1128–29.

tion alone which respondent seeks to vindicate in this action in federal court is quite different from the "liberty" or "property" recognized in those decisions. *Id.* at 711, 96 S.Ct. at 1165.

Instead, the Court indicated that a constitutionally recognized liberty interest depends on the existence of a special, tangible relationship between the government and the individual in specific contexts. A property interest explicitly created and protected by independent state or federal law undoubtedly creates such a relationship and satisfies the threshold aspect of this "reputation plus" standard. *See id.* at 711–12, 96 S.Ct. at 1165–66. The *Paul* court, however, clearly indicated that the "other governmental action," *id.* at 699, 96 S.Ct. at 1159, required to satisfy the "plus" in this formula also includes a loss of government employment or a foreclosure of future government employment opportunities.

> While we have in a number of our prior cases pointed out the frequently drastic effect of the "stigma" which may result from defamation from the government in a variety of contexts this line of cases does not establish the proposition that reputation alone, *apart from some more tangible interest such as employment,* is either "liberty" or "property" by itself sufficient to invoke the procedural protection of the Due Process Clause.

*Id.* at 701, 96 S.Ct. at 1160–61 (emphasis added); *see also id.* at 705, 96 S.Ct. at 1163 (noting that protected liberty interests are implicated " 'where government action has operated to bestow [stigma] with *an attendant foreclosure from other employment opportunity.*' ") (quoting *Cafeteria & Restaurant Workers v. McElroy,* 367 U.S. 886, 898, 81 S.Ct. 1743, 1750, 6 L.Ed.2d 1230) (emphasis added by the *Paul* court); *id.* at 706, 96 S.Ct. at 1163 ("[T]he Court has never held that the mere defamation of an individual ... was sufficient to invoke the guarantees of procedural due process absent *an accompanying loss of government employment.*") (emphasis added) (footnote omitted).

This reading of the "reputation plus" standard is also inescapable in light of the *Paul* Court's treatment of *Roth v. Board of Regents.* Although the government employee in *Roth* plainly did not enjoy any property or quasi-property interest in continued employment, *see Roth,* 408 U.S. at 578, 92 S.Ct. at 2709, the *Roth* Court indicated that the employee would have stated a liberty interest claim had the state sufficiently "stigmatized" him. *See id.* at 573, 92 S.Ct. at 2707; *see also infra* note 21. The *Paul* court expressly reaffirmed this dictum, emphasizing that government defamation accompanied by the loss of government employment would support a liberty interest claim.

While *Roth* recognized that governmental action defaming an individual in the course of declining to rehire him could entitle the person to notice and an opportunity to be heard as to the defamation, its language is quite inconsistent with any notion that a defamation perpetrated by a government official but unconnected with any refusal to rehire would be actionable under the Fourteenth Amendment:

> "The state *in declining to rehire the respondent,* did not make any charge against him that might seriously damage his standing and association in his community ....
>
> "Similarly, there is no suggestion that the State, *in declining to re-employ the respondent,* imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities."

Thus, it was not thought sufficient to establish a claim under § 1983 and the Fourteenth Amendment that there simply be defamation by a state official; *the defamation had to occur in the course of the termination of employment.*

*Paul,* 424 U.S. at 709, 96 S.Ct. at 1164–65 (emphasis added) (quoting *Roth,* 408 U.S. at 573, 92 S.Ct. at 2707 (emphasis added by the *Paul* court)). In other words, *Paul* explicitly recognized that the combination of government defamation plus the failure

to rehire or the discharge of a government employee states a liberty interest claim even if the discharge itself deprives the employee of no property interest protected by the fifth or fourteenth amendments. As the Seventh Circuit has put it, "[i]t is the individual's status as a government employee and not his property interest in continued employment which furnishes the 'plus' that raises reputation to the level of a constitutionally protected liberty interest." *Dennis v. S. & S. Consolidated Rural High School Dist.*, 577 F.2d 338, 343 (5th Cir.1978); *see Colaizzi v. Walker*, 542 F.2d 969, 972–73 (7th Cir.1976) (same), *cert. denied*, 430 U.S. 960, 97 S.Ct. 1610, 51 L.Ed.2d 811 (1977); *see also infra* note 18 (collecting cases).

In *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1979), moreover, the Supreme Court unmistakeably indicated that *Paul* does not bar a liberty interest claim by a discharged government employee who does not enjoy a property right to continued employment. In *Owen*, a nontenured city employee

brought a liberty interest claim against the city and various city officials after he was discharged amidst stigmatizing allegations of impropriety. The *Owen* plaintiff did not enjoy any property interest in continued employment or any procedural protection from an "at-will" discharge. *See id.* at 630 n. 10, 631, 100 S.Ct. at 1405 n. 10.[14] Nonetheless, the Court found no merit in the government's contention that the employer could not state a claim under the liberty clause.

*Wisconsin v. Constantineau*, 400 U.S. 433, 437 [91 S.Ct. 507, 510, 27 L.Ed.2d 515] (1971), held that "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." In *Board of Regents v. Roth*, 408 U.S. 564, 573 [92 S.Ct. 2701, 2707, 33 L.Ed.2d 548] (1972), we explained that the dismissal of a government employee accompanied by a "charge against him that might seriously damage his standing and associations in his community"

---

**14.** The *Owen* plaintiff was discharged under a provision of the city charter granting the city manager authority to remove department heads "when deemed necessary for the good of the service." *Owen*, 445 U.S. at 625 n. 2, 100 S.Ct. at 1402 n. 2. This ordinance did not, however, create any constitutionally recognized property interest in continued employment and the Court did not indicate that the provision affected the liberty interest claim in any way. *See id.* at 633 n. 13, 100 S.Ct. at 1406 n. 13. The Court did not, for example, conclude that the *Owen* plaintiff enjoyed any "protected status" or "quasi" property interest created by independent statutory law that entitled him to relief under the liberty clause but not under the property clause. Indeed, the Court has never indicated that the existence of a constitutionally protected liberty interest turns on such an analysis. Even if it had, the same could be said of the case before us. Department attorneys are members of the Schedule A excepted service, *see* 5 C.F.R. § 213.-3101(d) (1984); as such, they are covered by a set of "performance appraisal" regulations designed to ensure that actual performance rather than supervisory whim is employed as the basis for personnel actions. *See id.* § 430.202 (extending performance appraisal coverage to Schedule A civil servants); *id.* §§ 430.201–430.207 (describing performance appraisal criteria). In practice, "career" employees classified as Schedule A civil servants also enjoy a *de facto* type of tenure that, for example, Schedule C or policy-

making executive appointees, *see id.* § 213.3301, do not. *See Committee to Protect the First Amendment Rights of Employees of the Department of Agriculture v. Bergland*, 626 F.2d 875, 880 (D.C.Cir.1979), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3012, 65 L.Ed.2d 1113 (1980). While we think that the case law clearly supports a liberty interest claim for defamed and discharged government employees regardless of any such regulations, the Department's internal rules and practices certainly belie Judge MacKinnon's assertion that our decision involves civil servants put intentionally by Congress at the beck and call of the Executive. *See* Diss.Op. of MacKinnon, J., at pp. 1122–24.

Of course, this case does not *in any way* implicate or constrain the executive's plenary power to remove policy-making executive appointees. The scope of the executive's removal power is generally governed by the appointments clause and its surrounding jurisprudence. *See, e.g., Wiener v. United States*, 357 U.S. 349, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1958); *Humphrey's Executor v. United States*, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935); *Myers v. United States*, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926). We are therefore at a loss to understand how Judge MacKinnon's "separation of powers" argument, *see* Diss.Op. of MacKinnon, J., at 1126–28, affects this case.

would qualify as something "the government is doing to him," so as to trigger the due process right to a hearing at which the employee could refute the charges and publicly clear his name. In the present case, the [city's] accusations received extensive coverage in the press and even if they did not in point of fact "cause" petitioner's discharge, the defamatory and stigmatizing charges certainly "occur[red] in the course of the termination of employment." Cf. Paul v. Davis, 424 U.S. 693, 710 [96 S.Ct. 1155, 1165, 47 L.Ed.2d 405] (1976). Yet the city twice refused petitioner's request that he be given written specification of the charges against him and an opportunity to clear his name. Under the circumstances, we have *no doubt* that the Court of Appeals correctly concluded that the city's actions deprived petitioner of liberty without due process of law. *Id.* at 633 n. 13, 100 S.Ct. 1406 n. 13 (emphasis added).[15]

This circuit, in turn, has consistently interpreted *Paul*'s "stigma plus" test to require two forms of government action before a plaintiff can "transform a [common law] defamation into a [constitutional] deprivation of liberty." *Mosrie v. Barry*, 718 F.2d 1151, 1161–62 (D.C.Cir.1983). First, the government must be the source of the defamatory allegations. *See id.* at 1161. Second, the resulting "stigma" must involve some tangible change of status vis-a-

---

**15.** In effect, Judge MacKinnon argues in his dissent that, after *Paul,* a defamed and discharged government employee must be deprived of a statutorily created property interest or "protected status" in continued employment or statutory procedural protections in order to state a liberty interest claim. *See* Diss.Op. of MacKinnon, J., at pp. 1124–31. Because Doe lacked virtually any statutory job protection or procedural entitlements as a member of the excepted civil service, the argument goes, her liberty interest claim is precluded by *Paul.* This interpretation not only disregards the Supreme Court's treatment of *Roth* in *Paul* and its opinion in *Owens,* but also flies squarely in the face of this circuit's reading of *Paul, see infra* pp. 1108–1109, and has been rejected by every circuit on record, *see infra* note 18.

Judge MacKinnon's central mistake lies in his attempt to equate the interests protected by the *property* clause of the fifth amendment with those protected by the *liberty* clause. Under his reading of *Paul,* the liberty clause would be stripped of *any* independent meaning in the context of government defamation. Government employees who enjoy an independent property interest in continued employment, of course, must be afforded due process upon termination regardless of whether they are discharged in connection with stigmatizing allegations. That process will ordinarily afford those employees an opportunity to refute stigmatizing allegations. The liberty clause, by contrast, protects reputation, not job tenure, in the government employment context. Although *Paul* requires the alteration of some governmentally recognized status in addition to defamation, the *Paul* court plainly declined to equate that additional component with an independent, constitutionally protected property interest.

Similarly, Judge MacKinnon's interpretation of *Paul* cannot stand in light of *Codd v. Velger* itself. In *Codd,* a probationary government employee who had no property interest in his job, *see Codd,* 429 U.S. at 628 n. 2, 97 S.Ct. at 884 n. 2, brought a liberty interest claim against the state after he was discharged amidst stigmatizing allegations. The Court eventually held that the employee could not state a liberty interest claim because he had not alleged that the stigmatizing allegations were false and therefore did not seek to clear his name. *See id.* at 627–29, 97 S.Ct. at 884–85. The Court explicitly recognized, however, that "at-will" government employees state a claim under the liberty clause when discharged in connection with sufficiently stigmatizing and publicized allegations. "[T]he hearing *required* [by the due process clause of the fourteenth amendment] when a *nontenured* employer has been stigmatized *in the course of a decision to terminate his employment* is solely 'to provide the person an opportunity to clear his name.'" *Id.* at 627, 97 S.Ct. at 884 (emphasis added).

The *Codd* Court's reaffirmation that the liberty clause creates an independent constitutional right of action recognizes that government employees defamed in the course of job termination can state a liberty interest claim under the *Paul* standard notwithstanding the absence of independent statutory job protection. Indeed, the flexible name-clearing hearing required under *Codd* and *Roth* is expressly designed as a constitutional remedy for the class of individuals who have been defamed by government officials but whose relationship to the government does not rise to the level of a constitutionally protected property interest. In light of *Roth, Paul, Codd* and *Owens,* that class unmistakably includes defamed government employees who have been discharged or effectively foreclosed from future government employment.

vis the government. As the *Mosrie* court explained:

> [T]he principal recent cases from this court in which a government-imposed stigma was found to have deprived the stigmatized person of a liberty interest involved *either* loss of employment *or* foreclosure of a right to be considered for government contracts in common with all other persons.

*Id.* at 1161 (emphasis added). In *Mosrie,* moreover, we expressly recognized that a discharge from government employment satisfies *Paul's* "reputation plus" requirement regardless of whether the employee can point to any independent property interest in continued employment. "For a defamation to give rise to a right to procedural due process, it is necessary—we need not say when it is sufficient—that the defamation be *accompanied by a discharge from government employment* or at least a demotion in rank and pay." *Id.* at 1161 (emphasis added).[16] Although the *Mosrie* plaintiff could not meet this requirement, we clearly indicated that *Paul* does not bar a defamation suit by a discharged government employee.

> The harms suffered by appellant in this case do not meet the *Paul v. Davis* requirement of *loss of a government position or* change in legal status. Appellant was merely transferred laterally, not discharged from government employment or demoted in rank and pay. To find the lateral transfer a deprivation of liberty would be inconsistent with *Paul v. Davis's* repeated emphasis on "loss of

government employment," and, in particular, with its reading of *Roth* as requiring a "termination of employment."

*Id.* (emphasis added); *see also id.* at 1162 ("[A]n actual loss of employment *or* change of legal status [is] sufficient to qualify as a deprivation of liberty when accompanied by stigmatizing remarks.") (emphasis added).

In *Conset Corporation v. Community Services Administration,* 655 F.2d 1291 (D.C.Cir.1981), and *Old Dominion Dairy Products, Inc. v. Secretary of Defense,* 631 F.2d 953 (D.C.Cir.1980), we likewise indicated that government defamation accompanied by an effective foreclosure of the ability to seek future government employment on the same terms as other similarly situated applicants satisfies *Paul's* reputation plus standard, notwithstanding the absence of any property interest or independent legal right to future government employment or contracts. *See Conset,* 655 F.2d at 1295–98 (government contractor states liberty interest claim under *Paul* despite its lack of an independent property interest); *Old Dominion Dairy,* 631 F.2d at 964–66 ("[I]t is clear that the opinion in *Paul v. Davis* supports the [plaintiff's] claim in this case. For ... it is precisely the 'accompanying loss of government employment' and the 'foreclosure from other employment opportunity' which is the injury resulting from the government defamation ...."); *see generally Mosrie,* 728 F.2d at 1161 (noting that *Conset* and *Old Dominion Dairy* "illustrate the meaning of the *Paul v. Davis* conception of liberty").[17]

---

**16.** Because the *Mosrie* plaintiff did not allege that he was discharged from government employment, the court did not have to decide whether the government's *charges* were sufficiently stigmatizing to support a liberty interest claim. *See infra* pp. 1110–11.

**17.** Judge MacKinnon's dissent suggests that our reading of *Paul* is somehow contrary to *Bush v. Lucas,* 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983), which, he asserts, allows Congress to deprive federal employees of all relief for constitutional violations. *See* Diss.Op. of MacKinnon, J., at pp. 1127–28. In fact, *Bush* held only that where civil servants enjoy meaningful *and constitutionally adequate, see Bush,* 103 S.Ct. 2411 n. 10, statutory remedies for first

amendment violations, federal courts should not imply an additional *Bivens*-type *damages remedy* under the constitution. The *Bush* holding in no way affects the scope of constitutional rights, *see id.* at 2409–11 & n. 14, and nothing in *Bush* or any other Court opinion casts doubt on the presumed availability of federal equitable relief against federal officials for committing constitutional violations. *See, e.g., Bivens v. Six Unknown Named Fed. Agents,* 403 U.S. 388, 404, 91 S.Ct. 1999, 2008, 29 L.Ed.2d 619 (1977) (Harlan, J., concurring); *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *Philadelphia Co. v. Stimson,* 223 U.S. 605, 32 S.Ct. 340, 56 L.Ed. 570 (1912).

On the record before us, we have no difficulty concluding that Doe's liberty interest claim satisfies the *Paul v. Davis* standard as interpreted by the Supreme Court and this circuit. Doe was discharged from government employment amidst stigmatizing allegations which have effectively foreclosed future employment opportunities with the government as well as private employers.[18]

The Department nonetheless argues that Doe's complaint does not state a claim under the liberty clause, apparently relying on *Roth*'s holding that the government's failure to rehire an employee does not by itself impose a constitutionally recognized stigma. Conceding that her discharge might vaguely "handicap" her future employment opportunities, the DOJ contends that every termination makes an employee less attractive to prospective employers and that more than a "mere impediment to finding new employment" is required for a deprivation of a liberty interest. *See* Brief for Appellees at 26–27. In effect, the Department argues that although the allegations of unprofessionalism and dishonesty were responsible for the plaintiff's loss of her government job, the DOJ has not significantly harmed Doe's professional reputation. It urges that we read into the *Paul-Roth* standard a third threshold requirement: the plaintiff must allege not simply the harm attendant upon a discharge for misconduct, but an additional and more substantial injury to reputation.

In support of this argument, the Department points to this court's holding in *Mazaleski v. Treusdell*, 562 F.2d 701 (1977), that a federal employee could not, under the "particular facts" alleged, prove a deprivation of liberty when he was discharged for substandard work. *See id.* at 714. The *Mazaleski* court reasoned that because all involuntary terminations adversely affect future employment, bare discharge was not enough to make out a constitutional action absent some specific "stigma." *See id.* at 713. The plaintiff in this case, however, was not simply discharged for unspecified reasons; she was instead terminated for unprofessional conduct and dishonesty. She alleges that the public dissemination of those charges—not the mere fact of her termination—has stigmatized her professional reputation and foreclosed future employment opportunities. The *Mazaleski* court itself recognized that charges of dishonesty leading to dismissal—like the charges of disloyalty involved in several Supreme Court cases[19]—infringe a government employee's protected liberty interests in professional reputation. *See id.* at 714 & n. 37. And *Roth* likewise indicated that

---

**18.** In addition to the opinions of the Supreme Court and this circuit discussed above, we note that an *overwhelming majority* of the circuits have explicitly concluded that a nontenured, at-will government employee states a liberty interest claim after *Paul* when discharged or foreclosed from future government employment amidst stigmatizing allegations by the government. *See, e.g., Rodriguez de Quihonez v. Perez*, 596 F.2d 486, 488–89 (1st Cir.), *cert. denied*, 444 U.S. 840, 100 S.Ct. 78, 62 L.Ed.2d 51 (1979); *Beitzell v. Jeffrey*, 643 F.2d 870, 878 (1st Cir. 1981); *Huntley v. Community School Bd.*, 543 F.2d 979, 984–86 (2nd Cir.1976), *cert. denied*, 430 U.S. 929, 97 S.Ct. 1547, 51 L.Ed.2d 773 (1977); *McKnight v. Southeastern Pennsylvania Transp. Auth.*, 583 F.2d 1229, 1234–38 (3d Cir. 1978); *Robertson v. Rogers*, 679 F.2d 1090, 1091 (4th Cir.1982); *Dennis v. S. & S. Rural High School Dist.*, 577 F.2d 338, 340–343 (5th Cir. 1978); *Colaizzi v. Walker*, 542 F.2d 969, 972–74 (7th Cir.1976), *cert. denied*, 430 U.S. 960, 97 S.Ct. 1610, 51 L.Ed.2d 811 (1977); *Churchwell v. U.S.*, 545 F.2d 59, 61–63 (8th Cir.1976); *McGhee v. Draper*, 639 F.2d 639, 642–43 & n. 2 (10th Cir.

1981); *Campbell v. Pierce County*, 741 F.2d 1342, 1344–45 (11th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1754, —— L.Ed.2d —— (1985); *cf. Beller v. Middendorf*, 632 F.2d 788, 805–06 (9th Cir.1980), *cert. denied*, 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405 (1981). Indeed, we are not aware of *any* appellate court that has adopted the cramped view of *Paul* advanced by Judge MacKinnon in his dissent. Accordingly, his charge that we are somehow undertaking a new attempt to "extend" due process rights and that our holding "lacks any compelling precedential support and ... flies in the face of the text and the history of the [liberty] clause," Diss.Op. of MacKinnon, J., at p. 1131, is simply mistaken.

**19.** *See e.g., Cafeteria Workers v. McElroy*, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); *Wieman v. Updegraff*, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952); *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951); *United States v. Lovett*, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946).

a termination amidst charges of dishonesty infringes reputational interests protected by the liberty clause. *See Roth,* 408 U.S. at 573, 92 S.Ct. at 2707; *see also Owen,* 445 U.S. at 633 n. 13, 100 S.Ct. at 1406 n. 13.

Indeed, this circuit has consistently held that government allegations akin to those involved in this case infringe protected liberty interests when accompanied by a discharge from government employment. In *Old Dominion Dairy,* we held that a government contractor's liberty interests were infringed when the government failed to renew a contract and branded the plaintiff as "nonresponsible" due to "a lack of integrity" without affording the contractor a meaningful opportunity to clear its name. In *Old Dominion Dairy,* as in the case before us, the "lack of integrity" charge had been communicated to other government agencies "and would undoubtedly have been recommunicated every time [the plaintiff] bid on a subsequent contract." *Old Dominion Dairy,* 631 F.2d at 963; *see also id.* at 966 n. 24. The opinion emphasized the severely stigmatizing nature of the government's determination that the plaintiff lacked integrity, *id.* at 963–64 (quoting *Roth,* 408 U.S. at 573, 92 S.Ct. at 2707), and it pointed out that the *Mazaleski* court had "expressly stated ... that the employee was not terminated for grounds of dishonesty, noting that dismissals in such a case have been held to affect liberty interests." *Id.* at 964; *see Mazaleski,* 562 F.2d at 714.

Similarly, in *Conset,* we reversed a summary dismissal of a liberty interest claim where the plaintiff alleged that the government had circulated a memorandum calling into question its business integrity thereby barring the plaintiff from future government employment. Again, the court emphasized the stigma attendant upon a charge of dishonesty. *See Conset,* 653 F.2d at 1295–96 & n. 12; *cf. Rolles v. Civil Service Commission,* 512 F.2d 1319 (D.C. Cir.1975).

Most recently, in *Mosrie,* we held that a supervisory police officer publicly charged with unprofessionalism and subsequently transferred to another division could not meet the *Paul* standard because the defamation did not coincide with a "loss of a government position or a change in legal status." *Id.* at 1161. Yet the *Mosrie* court explicitly recognized that a government employee's or contractor's liberty interests are infringed by charges of unprofessional conduct or dishonesty when the allegations are accompanied by "discharge" or a bar to future government employment. *See id.* at 1161–62 (discussing *Old Dominion Dairy, Conset,* and *Rolles*).[20]

█ The net result of this line of cases, then, is that a plaintiff's claim that the government has deprived him or her of a constitutionally protected liberty interest in reputation must meet two requirements. *Paul* and *Mosrie* require that a plaintiff demonstrate that the government's defamation resulted in a harm to some interest beyond reputation. Loss of present or future government employment, however, satisfies that required additional interest. *Roth* and other recent liberty interest cases in this circuit indicate a second inquiry. A government discharge does not by itself constitute an injury to an employee's liberty interest in reputation; a plaintiff must allege that the government has actually stigmatized his or her reputation by, for example, charging the employee with dishonesty, and that the stigma has hampered future employment prospects. This case meets that requirement as well: Doe was discharged on the basis of allegations of

20. *Bartel v. FAA,* 725 F.2d 1403 (D.C.Cir.1984), also involved an allegation of government defamation *in the absence* of any accompanying loss of government employment. We therefore required the plaintiff to show that he was foreclosed from seeking future *government* employment by the defamatory charges; we eventually concluded that the employee alleged a protected liberty interest because an FAA letter had accused him of Privacy Act violations and thus hampered his ability to seek government employment on an equal basis with others of similar skill and experience. *See id.* at 1415. *Bartel* also suggested that the possible harmful effects of the defamatory letter on future private sector employment were not actionable under the liberty clause. *See id.* at 1415–16.

unprofessional conduct and dishonesty, and the charges were allegedly disseminated to prospective employers, public and private. The harm resulting from the Department's actions thus constitutes a deprivation of a liberty interest that cannot be effected without due process.[21]

C. *The Process Due*

As we have already indicated, the proper remedy for the Department's infringement of Doe's liberty interest in reputation is an opportunity for Doe to refute the charges and clear her name. *See Codd v. Velger,* 429 U.S. 624, 627, 97 S.Ct. 882, 884, 51 L.Ed.2d 92 (1977). Although the district court did not consider whether the plaintiff's *liberty interest* was afforded adequate procedural protection by the DOJ investigation in this case,[22] our reading of the complaint and motion to dismiss leads us to conclude that Doe was never afforded the meaningful opportunity to clear her name required by the fifth amendment. The March 24, 1981, meeting with her supervisors at which she was initially accused of unprofessional conduct surely did not satisfy her due process rights. The plaintiff was not given *any* notice whatsoever of the charges against her prior to that meeting; indeed, she was told that the meeting would consist of a routine briefing. *See supra* p. 1096. Due process requires that an individual be given notice *before* a hearing if there is to be a meaningful opportunity to respond. *See Roth,* 408 U.S. at 573, 92 S.Ct. 2707; *Boddie v. Connecticut,* 401 U.S. 371, 378, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971); *Old Dominion Dairy,* 631 F.2d at 966–67. After Doe received notice that the "investigation" was complete and that the Department intended to terminate her as a result of those charges, she requested, but was refused, an opportunity to confront the sources of the allegations and to produce evidence on her own behalf. *See supra* p. 1097.[23]

**21.** Judge MacKinnon's dissent suggests that our holding creates an "inexplicable paradox" concerning the government's relationship with some of its employees: "They may be dismissed for no reason given without a hearing, but for being drunk on the job, incompetent, or dishonest (or any other reputation damaging charge), they may not be dismissed without a hearing." Diss.Op. of MacKinnon, J., at p. 1122. We find nothing paradoxical in the conclusion that the government should afford discharged employees a bare opportunity to be heard when it slanders their professional reputation and effectively forecloses future employment opportunities. This "paradox," moreover, results from nothing more than the dictates of the due process clauses of the Constitution. As the Court put it in *Roth:*

In a Constitution for a free people, there can be no doubt that the meaning of "liberty" must be broad indeed.... The State, in declining to rehire [the plaintiff] did not make any charge against him that might seriously damage his standing and associations in his community. It did not base the nonrenewal of his contract on a charge, for example, that he had been guilty of dishonesty, or immorality. Had it done so, this would be a different case....

Similarly, there is no suggestion that the State, in declining to re-employ [him], imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities. The State, for example, did not invoke any regulations to bar [him] from all other public employment in state universities. Had it done so, this, again, would be a different case.

*Roth,* 408 U.S. at 572–73, 92 S.Ct. at 2707.

**22.** The district court did rule that Doe was given adequate *pre*-termination process to protect whatever *property* interest she might have had in her position with the Department. *See Opinion* at 5 ("[P]laintiff was not denied due process *in the decisions to terminate her.*") (emphasis added). Despite the Department's persistent assertions to the contrary, *see* Brief for Appellees at 21–26, this aspect of the district court's ruling does *not* apply to the post-termination process due under Doe's liberty interest claim.

**23.** The Department argues that Doe was given an adequate opportunity to clear her name because, once she learned of the charges against her on March 24th, she could have taken steps on her own to present her version of the events in dispute to the Department before her May 15th termination. *See* Brief for Appellees at 22. It is undisputed, however, that the Department refused Doe anything approximating a "hearing" after it completed its investigation and decided to terminate her. We hold that the bare "opportunity" to "force the issue" between March 24th and May 15th cannot satisfy the dictates of due process. *See Old Dominion Dairy,* 631 F.2d at 966–97.

We therefore vacate the district court's dismissal of Doe's liberty interest claim against the Department. If Doe can demonstrate that the stigmatizing reasons for her discharge were disclosed to the public or were made available to prospective employers or other government personnel, she is entitled to a *Codd* hearing. *See Bishop v. Wood*, 426 U.S. 341, 348–49, 96 .S.Ct. 2074, 2079–80, 48 L.Ed.2d 684 (1975) (emphasizing public disclosure); *Old Dominion Dairy*, 631 F.2d at 963 (emphasizing the availability of stigmatizing charges to government personnel and to prospective employers). Assuming that Doe can meet this minimal burden,[24] the district court will be required to determine the precise nature of the name-clearing procedure that the Department must provide Doe.[25] The standard of *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) will presumably govern that determination.[26] In *Mathews*, the Court identified the factors that must be weighed in order to determine the process due under the fourteenth or fifth amendments.

Identification of the specific dictates of due process generally requires consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 334–35, 96 S.Ct. at 903.

Although we leave it to the district court to specify the precise contours of the *Codd* hearing, we note that the private interest

**24.** We note, for example, that DOJ officials discussed the allegations against Doe with several water-rights attorneys involved in the Wyoming litigation shortly after her reassignment to Washington. *See supra* pp. 1096–97. The "public disclosure" requirement would also be satisfied if the Department placed Doe's termination memorandum in her personnel file and made that file available, even on a limited basis, to prospective employers or government officials. *See Bishop*, 426 U.S. at 348, 96 S.Ct. at 2079. In this regard, we think it appropriate to recall a statement by the Seventh Circuit in a similar case:

> The [government] points out that its findings will not be made public and are available to the various agencies only on a need to know basis. However, the federal government is composed of many different agencies and departments, all of which could obtain the information under various circumstances. In effect, [the plaintiff] has been stigmatized throughout the entire federal government. [S]he is deprived of the opportunity to work in any capacity for any branch of the government.

*Larry v. Lawler*, 605 F.2d 954, 958 (7th Cir. 1978); *see also Old Dominion Dairy*, 631 F.2d at 966 (quoting *Larry*).

**25.** Throughout his dissent, Judge MacKinnon suggests that our decision means that government officials must hold a hearing every time they seek to remove a government employee. *See* Diss.Op. of MacKinnon, J., at pp. 1119–20, 1122–23, 1128–31. That is clearly wrong. Instead, we conclude only that a government employee must be given a name-clearing hearing when the government disseminates allegedly false and reputation-destroying charges against her in the course of her discharge. We remand to the district court for a determination of what kind of process she is due. We have not ruled that Doe or any other government employee must be given a *Codd* hearing before she is terminated in order to remedy a liberty interest violation. Furthermore, our decision does not *in any way* affect actual government personnel decisions: at-will government workers can be *removed from government employment* for any reason or no reason at all consistent with the dictates of the liberty component of the due process clause. We hold *only* that a government employee must be afforded *some* opportunity to clear her name when the government has terminated her amidst defamatory charges that, in effect, have destroyed her professional reputation. Accordingly, Judge MacKinnon's parade of horribles, *see, e.g.,* Diss.Op. of MacKinnon, J., at p. 1123 ("If a judge wants to fire a clerk,...a hearing must be held."), is just that.

**26.** *But see Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (not mentioning *Mathews* in deciding that a hearing is required where the stigma of mental illness was imposed on inmate); *Lassiter v. Department of Soc. Services*, 452 U.S. 18, 59–60, 101 S.Ct. 2153, 2176, 68 L.Ed.2d 640 (1981) (Stevens, J., dissenting) (suggesting that *Mathews* should only apply to property interests).

affected by the Department's action in this case is quite substantial: it encompasses not merely a discrete employment opportunity but Doe's professional reputation and future career as an attorney in the government or private practice. *See Larry v. Lawler,* 605 F.2d 954, 961 (7th Cir.1978). Furthermore, the risk of erroneous deprivation was exacerbated in this case by the reliance on affidavits from individuals whose reliability and veracity have been called into question by the plaintiff. *See Larry,* 605 F.2d at 960; *cf. Goldberg v. Kelly,* 397 U.S. 254, 261, 90 S.Ct. 1011, 1016, 25 L.Ed.2d 287 (1970). Finally, the administrative burdens involved in a post-termination *Codd* hearing do not in any way interfere with the Department's *employment* decisions; the issue in the *Codd* hearing will be the veracity of the Department's charges, not the propriety of the discharge itself.[27]

## IV. THE CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS

The district court ruled that Doe's *Bivens* action against the individual defendants was barred by the local one year statute of limitations governing defamation actions. We agree that the one year limitations period should be applied to the claims against the individual defendants. The panel further concludes that the district court correctly construed Doe's complaint to provide unambiguous grounds for dismissal of these claims as time-barred.

### A. *The Appropriate Statute of Limitations for Doe's* Bivens *Action*

When a federal action contains no statute of limitations, courts will ordinarily look to analogous provisions in state law as a source of a federal limitations period. *See, e.g., Burnett v. Grattan,* —— U.S. ——, 104 S.Ct. 2924, 2929, 82 L.Ed.2d 36 (1984); *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 464, 95 S.Ct. 1716, 1722, 44 L.Ed.2d 295 (1975); *Brown v. United States,* 742 F.2d 1498, 1503 (D.C. Cir.1984) (en banc). Concluding that "damage to reputation ... is central to the [plaintiff's] claim," *Opinion* at 2, the district court applied the District of Columbia's one year statute of limitations governing defamation actions to Doe's *Bivens* suit. *See* D.C.Code § 12–301(4).[28] We agree with the district court that the one year limitations period should be applied.

The gist of Doe's claims against the individual defendants is that they disseminated false and defamatory statements to other attorneys, statements which "destroyed her reputation as a sober and serious person." Plaintiff's Complaint ¶ 28, J.A. at 12. She seeks the traditional damages remedy to which she would be entitled in a common law defamation action. In *Burnett,* the Supreme Court indicated that the limitations period for the most analogous state action is ordinarily appropriate for the federal action if it adequately accounts for the practicalities of litigating, and the substantive policies underlying, the federal claim. *See Burnett,* 104 S.Ct. at 2929. We can discern no difference in the practicalities of or the policies behind a *Bivens* action for the deprivation of a liberty interest in reputation and an ordinary defamation claim. *See Olinger v. American Savings and Loan Ass'n,* 409 F.2d 142 (D.C.Cir.1969). Moreover, this circuit has previously applied the one year limitations period con-

---

27. We also note that other courts considering *Codd* hearings have "required that the claimant have notice of the charges against [her], and an opportunity to refute, by cross-examination or independent evidence, the allegations which gave rise to the reputational injury." *Campbell v. Pierce County,* 741 F.2d 1342, 1345 (11th Cir. 1984); *see also Endicott v. Huddleston,* 644 F.2d 1208, 1216–17 (7th Cir.1980).

28. The D.C. statute of limitations reads, in relevant part:

Except as otherwise specifically provided by law, actions for the following purposes may not be brought after the expiration of the period specified below from the time the right to maintain the action accrues: ...
(4) for libel, slander, assault, battery, mayhem, wounding, malicious prosecution, false arrest or false imprisonment—1 year; ...
(8) for which a limitation is not otherwise specially prescribed—3 years;
D.C.Code § 12–301.

tained in section 12–301(4) to constitutionally based defamations actions. *See Church of Scientology v. Foley*, 640 F.2d 1335 (D.C.Cir.1981) (per curiam) (en banc), *cert. denied*, 452 U.S. 961, 101 S.Ct. 3110, 69 L.Ed.2d 972 (1981).[29] *See also McClam v. Barry*, 697 F.2d 366 (D.C.Cir.1983) (applying the local statute of limitations governing assault to a police brutality action because the facts necessary to prove the constitutional claim and the interests protected by the constitutional tort were most analogous to common law assault).[30]

 After determining that the relevant limitations period was one year, the district court construed the plaintiff's complaint to allege that the individual defendants spread the allegedly defamatory charges against Doe only at the time of her discharge from the Department; since she was terminated well over a year before the suit was filed, the district court ruled that the *Bivens* claim was time-barred. *See*

29. In *Foley*, we affirmed a district court's dismissal of a *Bivens* claim for injury to reputation that had occurred over a year before the action was filed. In doing so, we vacated a panel decision which had permitted the action to proceed despite the local one-year limitations period on defamation claims.

30. We recently reconsidered and rejected the *McClam* court's approach to determining when there is a deficiency in federal law that triggers the borrowing doctrine. *See Brown v. United States*, 742 F.2d 1498, 1504–07 (D.C.Cir.1984) (en banc). *Brown*, however, did not question the *McClam* court's approach to choosing the most analogous local limitations provision after a court determines that a deficiency exists in federal law. *See id.* at 1501–03.

The plaintiff argues that the local three year limitations period on actions "for which a limitation is not otherwise specially prescribed," D.C.Code § 12–301(8), should govern her *Bivens* claims, essentially because those claims derive from the Constitution. To be sure, this circuit has on occasion stated that "[i]njuries inflicted by officials acting under color of law are significantly different" from those resulting from the acts of private individuals. *Payne v. District of Columbia*, 559 F.2d 809, 817, n. 32 (D.C.Cir. 1977). We have also admonished, however, that "the constitutional character of a cause of action *by itself* [is] not a ground for rejecting as not closely analogous an otherwise identical common-law cause of action." *McClam*, 697 F.2d at 373 (emphasis added). Other circuits

*Opinion* at 1095–96. As we have already stated, *see supra* pp. 1101–02, the district court was obliged to resolve any ambiguity in the complaint in Doe's favor before granting the Department's motion to dismiss for failure to state a claim. Accordingly, a motion to dismiss may be granted on the basis that the action is time-barred only when it appears from the face of the complaint that the relevant statute of limitations bars the action. *See Richards v. Mileski*, 662 F.2d 65, 73 (D.C. Cir.1981); *see also Jones v. Rogers Memorial Hospital*, 442 F.2d 773, 775 (D.C.Cir. 1971).[31]

J. SKELLY WRIGHT, Circuit Judge:

B. *Application of the Statute to Doe's Complaint*

 The critical paragraph of Doe's complaint reads, in relevant part:

[U]pon her removal from her position with the Department, the officials who

have applied longer, "catch all" limitations periods such as section 12–301(8) to constitutional torts on the reasoning that constitutional rights are more fundamental than the interests protected by common law actions. *See, e.g., Beard v. Robinson*, 563 F.2d 331 (7th Cir.1977), *cert. denied*, 438 U.S. 907, 98 S.Ct. 3125, 57 L.Ed.2d 1149 (1978); *Reagan v. Sullivan*, 557 F.2d 300 (2d Cir.1977). Our *en banc* decision in *Foley* compels us to forgo such a course. The Supreme Court has recently granted certiorari to determine the limitations period that should be applied to section 1983 claims, *see Garcia v. Wilson*, 731 F.2d 640 (10th Cir.), *cert. granted*, —— U.S. ——, 105 S.Ct. 79, 83 L.Ed.2d 28 (1984), and perhaps will offer us further guidance.

We also note that our holding that the one-year statute of limitations applies to Doe's *Bivens* claim does not extend to her liberty interest claim for equitable relief against the Department which we have remanded to the District Court. The issue of the statute of limitations applicable to the latter claim was not raised by the government below, addressed by the District Court, or argued to this court.

31. Under District of Columbia law, the statute of limitations begins to run upon the publication of the allegedly defamatory statements. *See Fitzgerald v. Seamans*, 553 F.2d 220, 229–30 (D.C.Cir.1977). Federal courts are, of course, free to incorporate local policies for applying limitations periods if there is a deficiency in federal law and if the local rules will effectuate the policies underlying the federal action. *See, e.g., Brown*, 742 F.2d at 1503–07.

are named defendants here allowed, permitted, aided and abbetted [sic] in the spreading of the charges and the allegations by other officials of the Department of Justice amongst members of the bar in western states (and other lawyers and non-lawyers in western states and elsewhere) who deal with water rights.... This made it and continues to make it impossible for plaintiff to obtain other employement [sic] because it destroyed her reputation as a competent and capable attorney and as a sober and serious person.

Plaintiff's Complaint ¶ 28, J.A. at 12. Applying the standard noted above to the pertinent part of the complaint, we find that we are in agreement with the District Court's conclusion that the complaint, on its face, shows these claims to be time-barred. The language "upon her removal" unambiguously indicates that the alleged publication(s) occurred at the time of Doe's discharge. Thus, since the one year statute of limitations applies and since Doe did not file suit until almost two years after the alleged publication(s), it is clear from the face of the complaint that the statute of limitations bars these claims.[32]

WALD, Circuit Judge:

## V. CONCLUSION

For the reasons discussed above, we affirm the district court's holding that Doe's discharge did not violate any mandatory Department regulation and that Doe's claims for reinstatement and back pay were properly dismissed. The panel also affirms the district court's dismissal of her *Bivens* action against the individual defendants. Finally, we conclude that Doe is entitled to an opportunity to refute the charges against her and to clear her professional name if she can demonstrate that the allegations were made public. On remand, the district court will have two tasks. First, it must determine whether the reasons for Doe's discharge were in any way disclosed or made available to the public, prospective employers or other government officials. If they were, the court must then determine the nature of the name-clearing hearing due the plaintiff and order the Department to conduct that hearing.

*Affirmed in part, vacated in part and remanded.*

WALD, Circuit Judge, dissenting as to Part IV.B:

I would remand Doe's *Bivens* claims against the individual defendants with directions to the district court to grant Doe leave to amend her complaint in order to allege timely publication.

The law in this circuit is clear: a defense based on the statute of limitations is an *affirmative* defense that cannot succeed on a Rule 12(b)(6) motion unless it is *unequivocally* apparent from the *face* of the complaint that the statute precludes the action. *See Richards v. Mileski,* 662 F.2d 65, 72 (D.C.Cir.1981); *Jones v. Rogers Memorial Hosp.,* 442 F.2d 773, 775 (D.C.Cir.1971); *cf. Gordon v. National Youth Work Alliance,* 675 F.2d 356, 360 (D.C.Cir.1982) (noting that title VII complaints should not ordinarily be dismissed on Rule 12(b)(6) motion for failure to file within statutory time limits). Accordingly, Doe's *Bivens* claims should not be dismissed with prejudice at this stage simply because she failed to allege publication specifically within the relevant time period. Instead, a Rule 12(b)(6) dismissal would *only* be warranted if the complaint itself unmistakably indicated that Doe could not prove *any* set of facts that could give rise to a timely action. *See, e.g., Hepperle v. Johnston,* 544 F.2d 201, 202–03 (5th Cir.1976) (per curiam). Although the majority concedes, as it must, that the district court was obliged to resolve any ambiguity in the complaint in Doe's favor on a Rule 12 motion, it none-

---

**32.** Doe also contends that the limitations period has not yet begun to run in this case because she suffers a "continuing harm" from being forced to "self publish" the reasons for her discharge to prospective employers. *See* Brief for Appellant at 33. We reject this theory, as it would result in an open-ended limitations period for a discharge-related defamation. *See Fitzgerald,* 533 F.2d at 230.

theless concludes that Doe unequivocally alleged defamation on the *day* she was discharged, *and on that day only.* I cannot agree.

In *Richards,* we allowed a constitutionally based defamation action to proceed despite a Rule 12(b)(6) motion based on the applicable statute of limitations. In doing so, we noted that:

> There is an inherent problem in using a motion to dismiss for purposes of raising a statute of limitations defense. Although it is true that a complaint sometimes discloses such defects on its face, it is more likely that the plaintiff can raise factual setoffs to such an affirmative defense. The filing of an answer, raising the statute of limitations, allows both parties to make a record adequate to measure the applicability of such a defense, to the benefit of both the trial court and any reviewing tribunal. We do not hold that the use of a motion to dismiss is always improper to raise a statute of limitations defense, but we do suggest that a responding party often imposes an undue burden on the trial court and impedes the orderly administration of the lawsuit when he relies on a motion to dismiss to raise such an affirmative defense.

*Richards,* 662 F.2d at 72. In my view, the majority's conclusion that Doe's complaint *must* be read to *exclude the possibility* that she could prove timely publication cannot be squared with this standard.

First, I cannot agree that the critical paragraph of Doe's complaint, *see* Maj.Op. at p. 1115, expressly and unambiguously alleges that the defamatory statements were published at any particular time. The phrase "upon her removal" might refer to the time of the discharge, but it might as easily mean "after her removal" or "due to her removal." Moreover, this paragraph must be read in the context of Doe's law-

suit taken as a whole. The gist of Doe's claim is that persistent defamation by Department officials has prevented her from obtaining employment in her preferred field; indeed Doe alleges at several points in her complaint that she continues to suffer from the Department's defamation. *See id.; id.* ¶ 29, J.A. at 12–13. Although her "continuing harm" theory (*i.e.* that she has been forced to repeat the defamatory charges herself) is plainly unacceptable,[1] I think a fair reading of her complaint makes clear that she alleges that the continued actions of DOJ officials prevent her from obtaining employment in her preferred field.

Indeed, Doe's allegation that various DOJ officials aided and abetted in the *spreading* of the allegedly defamatory charges against her surely connotes a *continuing* practice of some sort, not a discrete, one-time defamation. And while a more detailed factual account of this alleged continuing practice may or may not bring the *Bivens* claim within the relevant limitations period, the allegation itself is squarely at odds with the majority's conclusion that Doe *unambiguously* alleged publication on one day, namely the day she was discharged. It certainly creates enough doubt in my mind to render appropriate a remand with leave to replead. Doe need only allege that the defendants published—or republished—false allegations concerning her lack of professionalism within the year before she filed her complaint in order to survive a Rule 12 motion on her *Bivens* claims.

The district court also relied on the failure of Doe's attorney to cite a more recent publication when asked to do so at the Rule 12(b)(6) hearing. *See Opinion* at 3 n. 2. Yet a reading of the relevant portion of that hearing shows that it was concerned with which statute of limitations (the one year or the three year provision) should

1. *See* Maj.Op. at pp. 1115–16 n. 24. If, however, the Department's allegedly defamatory affidavits and memorandum of termination have been placed in Doe's personnel file and the contents of that file disclosed to prospective employers or other government agencies, the

plaintiff may have a somewhat stronger "continuing publication" argument. *See, e.g., Old Dominion Dairy Products, Inc. v. Secretary of Defense,* 631 F.2d 953, 966 n. 24 (D.C.Cir.1980); *Larry v. Lawler,* 605 F.2d 954, 958 (7th Cir. 1978).

apply, not with the factual specificity of the allegations. If the district court sought factual material outside the pleadings in order to convert the Department's Rule 12 motion into a motion for summary judgment, it was required to give the parties reasonable notice of its intent to do so and an opportunity to submit relevant factual material. *See* Maj.Op. at p. 1095 n. 1. On appeal, Doe concedes that her attorney did not have this factual material before him at the Rule 12(b)(6) hearing. *See* Reply Brief for Appellant at 7 n. 3. She alleges, however, that she has always been prepared to prove publication of the alleged defamation within the one year period and is prepared to do so now. *See id.* To be sure, a prudent attorney might well have submitted allegations of timely publication after the Rule 12 hearing or on a motion to reconsider the judgment. Nonetheless, I would be reluctant to dismiss Doe's *Bivens* claims solely because her attorney could not produce factual material concerning publication at a hearing on the legal sufficiency of the complaint. *Cf. Gordon,* 675 F.2d at 360.

Indeed, the district court *clearly understood* that Doe could survive the Department's Rule 12 motion to dismiss by simply alleging a more recent publication. The court nonetheless concluded from Doe's lawyer's statement at oral argument, that Doe could not, *as a matter of fact,* allege timely publication.

> At oral argument, plaintiff's counsel was specifically asked by the Court when the plaintiff contends the most recent publication took place. Counsel could provide nothing more than vague allegations of publication at an unspecified time by a Justice Department attorney now deceased, and it is apparent to the Court that plaintiff cannot point to an instance of publication within the statutory period.

**2.** The Department argues that, even if Doe's *Bivens* claims are not barred by the statute of limitations, they are precluded by the Supreme Court's recent decision in *Bush v. Lucas,* 462

Opinion at 3 n. 2. I read this statement to indicate that the district judge *himself* appreciated the ambiguities in Doe's complaint and the possibility that Doe could rather easily defeat the Rule 12 motion by alleging, albeit with some specificity, a recent publication. In this context, the appropriate way to resolve the statute of limitations issue was to allow Doe to amend her complaint, to entertain a motion for a more definite statement on the publication issue, *see* Fed.R.Civ.P. 12(e), or to proceed to a summary judgment proceeding at which the requisite factual material—including Doe's allegations of timely publication to this court—could be placed at issue. A Rule 12(b)(6) motion is simply not the appropriate vehicle for resolving a decisive factual question against the pleader. *See, e.g., Gordon,* 625 F.2d at 366–67; *Richards,* 662 F.2d at 65; *see also* Maj.Op. at p. 1095 n. 1.

A majority of this court has concluded that Doe has alleged a constitutionally protected liberty interest in reputation and may be able to demonstrate a set of facts that would entitle her to an opportunity to clear her name. A *Codd* hearing at this late date, however, cannot completely undo the harms that Doe alleges she has suffered as a result of the DOJ's actions. Moreover, Doe alleges in this court that she is prepared to demonstrate that the Department has continued to disseminate the allegedly false charges against her up to the time of this appeal. The federal rules are designed to ensure that cases are tried on the merits, not on the pleadings. In my view, Doe should be allowed the opportunity to point to timely publication in order to seek *Bivens* damages against Department officials. *See* Fed.R.Civ.P. 8(f) ("All pleadings shall be so construed as to do substantial justice."); *see also Hickman v. Taylor,* 329 U.S. 495, 500–01, 67 S.Ct. 385, 388–89, 91 L.Ed. 451 (1947); *Shapiro v. Secretary of State,* 499 F.2d 527, 533–34 (D.C.Cir.1974).[2]

U.S. 367, 103 S.Ct. 2404, 2408, 76 L.Ed.2d 648 (1983). *Bush* declined to allow a career employee of the competitive civil service to bring a

MacKINNON, Senior Circuit Judge (dissenting in part and concurring in part):

As this case now stands, it is my opinion that this court does *not* have jurisdiction over Jane Doe's Back Pay Act claim.[1] It is uncertain because of defects in the record, moreover, whether we have jurisdiction over any of Jane Doe's claims in this case. Until this court's jurisdiction, which involves a question of jurisdictional amount, is determined, this court should not decide this case, and in no event should this court decide the Back Pay Act claim. Even assuming we have jurisdiction, however, I cannot agree with the panel's unwarranted application of the liberty component of the due process clause to Department of Justice employees. Justice Department employees have no "protected status," and therefore cannot maintain a liberty interest claim.

The appellant, moreover, did not ask for a hearing in her complaint, but for money damages. To reach its unfortunate result, the majority has had to construct the claim for a hearing out of broad cloth by reviewing the district court's Fed.R.Civ.P. 12(b)(6) dismissal on the facts alleged. The majority's opinion thus travels far to reach an absolutely new departure from the current practice concerning at will employment in the Justice Department and in the excepted service in general. The requirement that a name clearing hearing be held in cases like this one will interfere with the maintenance of high professional standards in the Jus-

tice Department. It will also threaten important separation of powers values which Congress intended to advance by excepting select parts of the Executive Branch from the usual Civil Service protections against at will discharge of employees. By following the analysis of *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), moreover, these results could have been avoided.

On the assumption that we have jurisdiction, I concur with the majority's opinion that the *Bivens* claims are barred by the District of Columbia statute of limitations for defamation. This result is clear from the face of Doe's complaint.

I.

To begin with, it is my view that this court does not have jurisdiction to decide the Back Pay Act[2] claim the majority addresses in Part II of its opinion. Nor could it have jurisdiction over that claim under any circumstances. Moreover, this court might not even have jurisdiction over *any* of the claims the majority reaches, depending on whether the Back Pay Act claim is for $10,000 or less or for more than $10,-000. While the complaint alleges the total matter in controversy is in excess of $10,-000,[3] it could not be more obvious that before this court reaches any of Jane Doe's claims on the merits, it must find that it has jurisdiction. That requires the factual question of the amount of the Back Pay

damages action under the first amendment. *Id.* at 2406. In particular, the Court held that

> Because such claims arise out of an employment relationship that is governed by comprehensive procedural and substantive provisions giving meaningful remedies against the United States, we conclude that it would be inappropriate for us to supplement that regulatory scheme with a new judicial remedy.

*Id.* The majority's disposition of the statute of limitations questions renders inappropriate any detailed discussion of *Bush's* applicability to Doe who, as a member of the excepted civil service, does not enjoy any meaningful remedies for constitutional violations under the relevant civil service laws that were decisive in *Bush*. Suffice it to say that I would decline to extend the *Bush* holding to bar a *Bivens* action by a federal employee who has no statutory

forum, including judicial review, for her constitutional claims. *Cf. Williams v. IRS*, 745 F.2d 702, 706 (D.C.Cir.1984) (per curiam) (declining to impose *Bush* as a bar to an action by a federal employee in part because the employee did not enjoy substantive or procedural protections under the relevant civil service law).

1. *See* Complaint (J.A. 1, 16); Doe v. Dept. of Justice, No. 83–1499 (D.D.C. Oct. 31, 1983) (mem.) J.A. 86; Brief of Appellant 2, 34–35.

2. 94 Stat. 2165 (codified at 5 U.S.C. § 5596 (1981)).

3. Complaint ¶ 2. However, it is impossible to tell what portion of the amount in controversy pleaded is attributable to the Back Pay Act claim.

Act claim to be remanded to the district court before any further proceedings.

It is uncontroversial that the Tucker Act, 28 U.S.C. § 1491, and 28 U.S.C. § 1346(a)(2), 78 Stat. 699 (1964), confers *exclusive* jurisdiction to the Claims Court over claims against the federal government that are for *more* than $10,000 and that arise out of Acts of Congress. Before the enactment of 28 U.S.C. § 1346(a)(2), all such claims, regardless of the amount, had to be brought before the Court of Claims. Section 1346(a)(2) afforded small claimants (those with claims for *$10,000 or less*) the convenience of being able to bring their actions in the local federal District Court, rather than before the Court of Claims in Washington, D.C. S.R. 1390, 88th Cong., 2d Sess. 1 (1964). It has always been clear, however, that for Back Pay Act claims for *more* than $10,000, the Claims Court has exclusive jurisdiction. 28 U.S.C. § 1346(a)(2). *Schulthess v. United States*, 694 F.2d 175, 177 (9th Cir.1982) ("Federal Courts hear only cases over which they have jurisdiction.... Under 28 U.S.C. § 1346 (the Tucker Act), district courts have jurisdiction over money claims against the United States that are based on the Constitution, Acts of Congress, executive regulations or contracts with the United States only if the claim involves $10,000 *or less* ..."); *Keller v. Merit Systems Protection Board*, 679 F.2d 220, 222–23 (11th Cir.1982) (" 'The Court of Claims is the sole forum for the adjudication of [a claim against the United States *exceeding* $10,-000], even though the claim would otherwise fall within the coverage of some other statute conferring jurisdiction on the district court.' " (quoting *Graham v. Henegar*, 640 F.2d 732, 734 (5th Cir.1981))); *Graham v. Henegar*, 640 F.2d 732, 734 (5th Cir.1981); *Cook v. Arentzen*, 582 F.2d 870, 873 (4th Cir.1978) ("... the district court had no jurisdiction because the amount of the claim *exceeded* $10,000.00 ..."); *Polos v. United States*, 556 F.2d 903, 905 (8th Cir.1977) ("such a [military pay] claim, when in *excess* of $10,000, is within the exclusive jurisdiction of the Court of Claims.") (emphasis in parentheticals add-

ed); *see also* S.R. 1390, 88th Cong. 2d Sess. 1 (1964). Thus if Jane Doe's Back Pay Act claim is for more than $10,000, the district court had no jurisdiction to decide it and it is not properly before this court for review.

Even if the Back Pay Act claim is for $10,000 or less, however, this court has no jurisdiction to hear it or *any* part of the case of which that claim is a part. While the district court would have concurrent jurisdiction with the Claims Court under 28 U.S.C. § 1346(a)(2) for a claim for $10,000 or *less*, the *appeal* from the district court of that claim *and of the whole case of which it was a part,* must go by law *exclusively* to the Court of Appeals for the Federal Circuit. Federal Courts Improvement Act of 1982, 28 U.S.C. § 1295(a)(2), 96 Stat. 37 (1982).

Therefore whether this court has jurisdiction for *any* of the claims the majority reaches depends on a factual question: For what amount is Jane Doe's Back Pay Act claim? If the answer is, for *more* than $10,000, then Part II of the majority opinion is wrong because the district court had *no* jurisdiction over the Back Pay Act claim in the first place. If the answer is, $10,000 or *less*, then all of the majority's opinion is wrong because this case was appealed to the wrong circuit, and should be transferred to the Federal Circuit Court forthwith. To settle this threshold jurisdictional matter, this court must remand the question of jurisdictional amount to the District Court for a hearing, rather than decide the case here on the merits. Especially given the important consequences that hinge on the question of jurisdictional amount, the defendant-appellee deserves the opportunity to dispute the facts concerning the Back Pay Act claim. Under that Act, an employee affected by an unjustified or unwarranted personnel action is entitled to "an amount equal to all or any part of the pay ... which the employee normally would have earned or received during the period if the personnel action had not occurred, *less any amounts earned by the employee through other employment during that period ...*" (emphasis added) 5 U.S.C.

§ 5596(b)(1)(A)(i) (Supp. V 1981). If Jane Doe has been employed in the private sector since her dismissal at a salary comparable to or better than that she received in the Justice Department, her Back Pay Act claim might well be less than $10,000. Moreover, Jane Doe was under an affirmative duty to mitigate her damages, and the amount mitigated, whatever it is, may not be included in the jurisdictional amount. *Stone v. United States,* 683 F.2d 449, 454 (D.C.Cir.1982).

The majority avoids this jurisdictional problem by simply *assuming* that Jane Doe's claim is for *more* than $10,000. While this handily preserves the jurisdiction of this court over the remainder of the case, it does so only at the expense of the rights of both parties. This is because this court does not know whether Jane Doe might prefer to *waive* her Back Pay Act claims in excess of $10,000 in order to preserve the district court's jurisdiction and bring her appeal to the Federal Circuit, where it might fare better. She has that right under 28 U.S.C. § 1653 (1976), and could exercise it by amending her pleading on remand. *See Goble v. Marsh,* 684 F.2d 12, 17 (D.C.Cir.1982). The federal government moreover may be able to prove that the Back Pay Act claim must be for less than $10,000, if Doe decides not to waive it. That Jane Doe made close to $45,000 per year, as the majority notes, is insufficient to establish the amount of the claim since by statute it must be offset by whatever her earnings were once she left government service. The majority assumes jurisdiction on the basis of mere speculation as to jurisdictional amount, and in so doing deprives Jane Doe of her right to waive part of her claim and the government of the right to contest jurisdiction in the district court.

After concluding the district court had no jurisdiction on the Back Pay Act claim, the majority goes on to affirm the district court's holding on the merits. Maj.Op. at 1101 ("We therefore affirm the dismissal for jurisdictional reasons as well as those stated by the district court.") This is no mean feat. The Back Pay Act claim for money, rather than for reinstatement, does not present a "difficult" jurisdictional issue. Presumably therefore the majority means to invoke *Secretary of the Navy v. Avrech,* 418 U.S. 676, 94 S.Ct. 3039, 41 L.Ed.2d 1033 (1974) (per curiam) only with respect to the related reinstatement claim. The majority thus has no *authority* to affirm on the merits the district court's holding on the Back Pay Act claim for money. This is what not having jurisdiction means. Nor does *Avrech, supra,* provide a way out of the paradox the majority has created: The only thing that makes the jurisdictional issue of whether Jane Doe's claim is for $10,000 or less or for more than $10,000 "difficult" is the majority's refusal to remand the issue to the proper forum. The majority expresses confidence that the courts which would properly have jurisdiction over the Back Pay Act claim if it is for more than $10,000, the Claims Court and the Federal Circuit, would agree with the holding of the district court as to the claim over which, the majority concedes, that court had no jurisdiction. The majority thus apparently intends to hold that one advisory opinion may properly affirm another, as if jurisdiction may be had by some principle of accumulation. And even to reach *this* dubious position, it should be recalled, the majority must assume away, quite improperly, the question of jurisdictional amount. The court should abandon this ill chosen redoubt and flee to the high ground of logic: Either a court has jurisdiction or it does not. This court should not decide the case until the jurisdictional basis of the district court's decision and this appeal is clear.[4]

---

**4.** The majority accuses the dissent of raising the jurisdictional issue "at the eleventh hour," even though it was not raised by the parties. *See* Maj.Op. at 1101. What the majority only grudgingly recognizes is that it is the duty of this and every court to raise jurisdiction at any time it may appear to be in doubt, *sua sponte* if necessary. *Athens Community Hosp., Inc. v. Schweiker,* 686 F.2d 989 (D.C.Cir.1982) (Courts may raise jurisdiction *sua sponte* ); *Ilan-Gat Engineers, Ltd. v. Antigua Intern. Bank,* 659 F.2d 234 (D.C.Cir.1981) (Courts always have jurisdiction

Under no circumstances, therefore, should the majority have reached the Back Pay Act claim; this court lacks jurisdiction to hear the appeal on that claim whatever the amount. And the legal question as to which court does have jurisdiction to reach any of the claims the majority addresses, including the important due process claim, must remain in doubt unless and until the jurisdictional amount of the statutory Back Pay Act claim is settled. As the record now stands, it is impossible to tell whether this court has jurisdiction. This question should not be hastily settled in manner that affects the rights of the parties without their having the opportunity to address the issue. This issue should be first decided by the District Court. I would support a remand for that determination. "It is a fundamental precept that federal courts are courts of limited jurisdiction. The limits upon federal jurisdiction, whether imposed by the Constitution or by Congress, must be neither disregarded nor evaded." *Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 374, 98 S.Ct. 2396, 2403, 57 L.Ed.2d 274 (1978).

## II.

The Department of Justice, like the other excepted branches of the Civil Service, has a special commitment to the highest professional standards. To promote these standards, Congress excepted the Department of Justice, and other parts of the Civil Service, from the hearings requirements the regular divisions of the Civil Service must observe before firing an employee. This excepted status traditionally has meant that a lawyer working for the Justice Department, even a United States Attorney confirmed by the Senate, could be fired at any time, for any reason. Now this court holds that one of the federal government's lawyers cannot be fired for drunken and obnoxious behavior while on

duty without implicating a liberty interest, the protection of which may require a name-clearing hearing. This attempt to extend due process introduces an inexplicable paradox into the national government's relationship with its lawyers: They may be dismissed for no reason without a hearing, but for being drunk on the job, incompetent, or dishonest (or any other reputation damaging charge), they may not be dismissed without a hearing. The panel, like some other circuit courts, makes its wrong step by incorrectly applying the holding of *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). The majority *does* apply analysis that comes from *Paul,* but apparently more from the dissent than the majority opinion. Before examining the analysis of the liberty interest of *Paul* in detail, however, it should be emphasized what a dramatic departure from the current, sound practice of the Executive Branch is represented by the majority opinion in this case.

Should the majority opinion ultimately prevail, the Justice Department will be encumbered with the necessity of holding hearings before or after it dismisses lawyers who have, through their unprofessional conduct, damaged the reputation of the Department and its client, the United States Government. This inhibition of the Justice Department's ability to act as the government's law firm, hiring, promoting and firing with freedom exceptional for a government bureaucracy, will only diminish the prestige of the Department while it confers no concrete benefit on the Jane Does who might suffer from arbitrary government employment decisions. The mere requirement that some kind of hearing be held, moreover, only forces government officials to observe certain formalities. It places no real obstacles in the way of superiors inclined to perpetrate an arbitrary personnel action, except perhaps that

to determine their jurisdiction); *Potomac Passengers Ass'n v. Chesapeake & O. Ry. Co.,* 520 F.2d 91 (D.C.Cir.1975) (A court, whether trial or appellate, has a duty to notice a failure of subject matter jurisdiction on its own motion at any time during the proceedings); *U.S. v. Anderson,*

464 F.2d 1390 (D.C.Cir.1972) (a defect in jurisdiction may not be ignored); *Whitney Nat'l Bank v. Bank of New Orleans & Trust Co.,* 323 F.2d 290 (D.C.Cir.1963) (Jurisdiction is a threshold question which must be examined).

they be conducted in silence. To provide real protection, substantive limitations would have to be placed on official discretion. *Cf. Olim v. Wakinekona,* 461 U.S. 238, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983). But that course would take the court far into the legislative realm, for it would require it to weigh at every turn the importance of the values of professionalism and accountability to the President which the exceptions Congress created for the Justice Department (and the rest of the excepted service) were meant to advance.[5] But the majority's opinion goes even further than this: It would seem to require, for example, that the President, or the Attorney General, or the Chairman of the Joint Chiefs of Staff hold a name clearing hearing either before or after he or she fired any of his or her officers, most of whom fall into the category of the excepted service, or some other special legal status created by statutes or regulations. This is so, assuming *only* that an official was firing a subordinate for some reason that the public or future employers would eventually find out about and that was damaging to that officer's reputation (as are most discharges for reason). So if the Director of the Arms Control and Disarmament Agency was caught selling military secrets to the KGB, he could not be fired without a hearing if the reason were given, or if the Administrator of the Environmental Protection Agency was found to have accepted bribes from major toxic waste polluters, she could not be fired without a hearing if the reason were given.

Of course, the effect of the majority's opinion will not be limited to the Executive Branch. When a Congressman wants to fire a staff aid and the reasons are such that they cannot be kept secret, a hearing must be held. If a judge wants to fire a law clerk, or the court wants to fire the clerk of the court, a hearing must be held if a reason is given for the firing. The effects of this decision will be widespread. If the majority opinion does not require these results, then *why* doesn't it? One cannot say, because Congress has intentionally excepted certain high government officials from any requirement of a hearing: That is what this case explicitly prohibits. Nor can one say, if Congress wants to permit the President (or some other officer of the Executive Branch) to fire subordinates, at will, without hearings, it can pass a law to that effect. Such a law would be invalid under the expansion of the due process clause decreed by the majority opinion.

Thus the majority opinion threatens important separation of powers values implicit in the concept of at will employment in the Executive, Legislative, and Judicial Branches. The President's ability to execute the policies the electorate affirms by its vote depends in part on the President's ability, and that of other high administration officials, to hire and fire policy making employees and officials freely, so that those who will support administration policies effectively hold office. Much of this job shuffling, especially at high levels, takes place in the glare of publicity and with an unspoken understanding that one should leave office gracefully. But politics within the Executive can also be rough and tumble. Allegations that are damaging to reputations frequently fly when jobs, and the power that goes with them, are at stake. The necessity for a name clearing hearing before or after someone is fired in a way that arguably damages his reputation will complicate and inhibit the manner in which a President and other administration officials may execute policy decisions.

The excepted civil service was created in part to recognize and protect politically sensitive and constitutionally important areas of government employment from such

---

**5.** In fact, Congress, through the House Post Office and Civil Service Committee, is conducting an investigation which may lead to legislation which would confer due process protection on members of the excepted service. *See,* Mathews, *Lawyer's Firing Prompts Hill Inquiry: Bill* *Considered to Aid 'Excepted Service' U.S. Employees,* Washington Post, Dec. 7, 1984 at A5. The majority opinion proposes to accomplish this legislative act before Congress has the chance to do so.

**1124**

procedural restraints. The majority's decision violates this policy while it will encourage, moreover, the undesirable policy of making decisions in secret and without giving reasons. This is so because all an official needs to do if he wants to avoid a name clearing hearing is not to give any reason for dismissing someone. *Cf. Molerio v. Federal Bureau of Investigation,* 749 F.2d 815 at 823–824 (D.C.Cir.1984) (government's defamatory reason for denying employee "top secret" security clearance not stigmatizing because unpublished and confidential). And it is frequently impossible, even if it were desirable, to keep the reasons for such decisions secret, for political reasons or because of other laws that require the giving of reasons.

It would be difficult to put forward an issue that raised more important separation of powers concerns than the relationship of the Chief Executive, or another high Executive official who is constitutionally charged with the faithful execution of the laws, to the country's principal law enforcement agency. When the court encounters such important constitutional concerns, it should look again at the major Supreme Court case to see what it really requires, especially when simply to apply tests generated by lesser authorities around that case would lead to such intuitively implausible results as the majority reaches here. By properly applying the liberty interest analysis in *Paul v. Davis, supra,* the encroachment on the separation of powers the majority opinion invites could have been avoided.

III.

*Paul v. Davis* in Part III holds that the interests that are comprehended within the meaning of either liberty or property, as covered by the due process clause of the Constitution, are those interests which have "attain[ed] constitutional status by virtue of the fact that they have been initially recognized or protected by state law," 424 U.S. at 710, 96 S.Ct. at 1165, or federal law. *Id.* at 712, 96 S.Ct. at 1166. Interests recognized as having a "protected status" in *Paul v. Davis* included, for example, the right given by issuing drivers' licenses to the citizens of a state to operate a vehicle on state highways, *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); the right afforded by a state to a parolee to remain at liberty as long as the conditions of parole are not violated, *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); the right of a student, conferred by state statute, to attend school, without suspension for misconduct without compliance with the procedural guarantees of the Fourteenth Amendment, *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); and the right of an individual under state law to purchase or obtain liquor in common with the rest of the citizenry which was violated by the "posting" of names of persons to whom liquor could not be sold, *Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). In interpreting *Constantineau* the Court in *Paul v. Davis* stated "[t]he 'stigma' resulting from the defamatory character of the posting was doubtless an important factor in evaluating the extent of harm worked by that act, but we do not think that such defamation, standing alone, deprived Constantineau of any 'liberty' *protected* by the procedural guarantees of the Fourteenth Amendment." 424 U.S. at 709, 96 S.Ct. at 1164 (emphasis added). It is thus only "protected interests" that can claim the protection of due process rights and as the opinion of the majority states:

As a member of the excepted civil service, Doe enjoyed no statutory entitlement to her position with the Department; similarly, the Department was not procedurally constrained by the civil service laws or any other regulations in its actual decision to terminate Doe.

Maj.Op. at 1100–01.

The majority opinion thus recognizes that Doe had no "protected interest" in employment in the Justice Department. It thus follows that Doe cannot have alleged a violation of a liberty interest.

This "protected interest" requirement at the heart of *Paul's* liberty interest analysis has thrived more in the circuit courts' analyses of constitutional property interests than of liberty interests. No one has suggested, however, that *Paul v. Davis* is not good law on the nature of the liberty interest. Dicta in *Roth,*[6] *Codd*[7] and *Paul* which might be interpreted to suggest that an at will government employee has a right to a hearing completely independent of any statutorily created procedural protection of a liberty interest notwithstanding, to apply the analysis the majority does here only confuses an important area of law. *See* Maj.Op. at 1104–10.

Justice Rehnquist discusses *both* liberty and property interests in Part III of *Paul v. Davis.* Perhaps it is his exposition of the two analyses at once that accounts for the majority's peculiar view that this dissent, by espousing *Paul,* is arguing the theory that before one can have a liberty interest in something one must first have a property interest in it. This is not at all the case. Nonetheless, it *is* true that the analyses of liberty and of property share essential features. They are similar, but they are not the same.

In Part III of *Paul,* Justice Rehnquist cites *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), a case unambiguously involving the *liberty* interest, before the Court, as it was, on writ of certiorari appealing a denial of a writ of habeas corpus. About this liberty interest case, raised in the classic liberty context of habeas corpus, the Justice wrote

> In *Morrisey v. Brewer* ..., the State afforded parolees the right to remain at liberty so long as the conditions of their parole were not violated. Before the State could alter the status of a parolee because of alleged violations of these conditions, we held that the Fourteenth Amendment's guarantee of due process of law required certain procedural safeguards.

> *In each of these cases, as a result of the state action complained of, a right or status previously recognized by state law was distinctly altered or extinguished.*

(Emphasis added.) *Id.* 424 U.S. at 711, 96 S.Ct. at 1165.

There can be no question that the Justice is referring to *Morrissey,* among others, when he says "in each of these cases." He is therefore applying the language emphasized above not only to the property interest, but *to the liberty interest* as well.

To see if a liberty interest has been violated, we must first look to see whether state law, or, under the Fifth Amendment, federal law provides some procedural protection against the removal of some liberty or property interest and then whether those protections have been removed or infringed by the state. This is true of *both* liberty and property interests, but *that* in no way implies the interests always overlap or that the analysis in this opinion implies that a liberty interest must always rest on a property interest. One may call this approach cramped, as the majority does. It certainly does not give judges as much freedom to interpret the due process clause as would a general guarantee that government will act fairly. Less pejoratively put, the view of this opinion is less cramped than it is precise and restrained.

It would be disingenuous to suggest that the Court has not refined and interpreted the *Paul v. Davis* analysis of the liberty interest since that case came down. In *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980), for example, Justice White followed an analysis that skillfully integrated both Justice Rehnquist's insights as to the origins of liberty interests with a perhaps more active conception of the judicial role in defending them. It represents the Court's current view of the liberty interest as it has evolved. That case stands for the proposition that while state or federal law creates the expectations that give rise to a liberty

---

6. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

7. *Codd v. Velger,* 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977).

interest, the process that is *due* to protect that interest is not limited to procedures mandated by that state or federal law.

*Vitek* involves the classic liberty interest against physical restraint and incarceration—the case involved the involuntary transfer of a convicted felon to a mental hospital—but its analysis is very appropriate to this case. This is because the acknowledgment that the creation of substantive liberty interests is effected by laws, state or federal, effectively solves the separation of powers problems that otherwise plague the majority's opinion.[8] This should not surprise us. Commentators have frequently criticized "substantive due process" as a doctrine that conveys excessive power to the judiciary, and what is really substantive due process analysis directed at the internal affairs of a coequal branch of the federal government is bound to cause separation of powers problems. But a procedural approach to due process in this context would have the court defer to the judgment of Congress as to whether to create liberty interests in otherwise statutorily unprotected employment in the Executive Branch, even while the court reserved the right to insure that the process due was observed, once those rights were created.

This approach also answers the possible objection that a relatively junior level lawyer in the Justice Department is not a cabinet officer and therefore we should just not worry about the separation of powers. Congress, this argument could go, just drew the line in the wrong place: Lawyers in the Justice Department should be protected, but very high level officials should not, for the separation of powers reasons above mentioned. But the law of

---

**8.** It is worth noting that there is no necessary tension between this view in Justice White's opinion and the view that certain fundamental liberties exist whether they have been recognized or not by state or federal legislatures. It is really just an application of the concept of legitimate expectations to the liberty interest. Some liberties we might expect just by virtue of being free and moral individuals; yet others we develop doubtless only because governments pass laws and set up institutions. Once laws are enacted, expectations are created where none existed before, e.g., for parole, or some government benefit, like a job. The question then becomes how much process is due to protect such expectations as are created.

The performance appraisal criteria applying to Schedule A excepted civil servants do not supply any procedural *protections* against at will discharge. *See* 5 C.F.R. §§ 430.101, 430.201. In particular, the majority points to no statute or regulatory provision that requires a hearing. Moreover, far from supporting the majority's opinion, *Committee to Protect First Amendment v. Bergland*, 626 F.2d 875 (D.C.Cir.1979), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3012, 65 L.Ed.2d 1113 (1980) holds that Schedule A protections, such as they are, do not prevent an at will discharge for political reasons where a job has significant policy making components. *Id.* at 880–81. So Schedule A status was held in this case to be *insufficient* to protect against an at will discharge. *Id.* at 880. As to what the dicta that Schedule A employees enjoy *"de facto* tenure" means, one can only guess. *Id.* It appears to mean merely that Schedule A employees are usually out of harm's way when Administra-

tions change. But the court continues "[h]owever, if a position does have significant policymaking components, it cannot be given *Elrod* —constitutional status merely on the basis of hopeful expectations." *Id.* The analysis thus turns on expectations, as does the analysis in this dissent, and the majority has pointed to nothing to suggest Jane Doe had a reasonable expectation in any certain protection granted to her by statute or regulation, against discharge, without a hearing and with reasons given, for unprofessional behavior. Congress created no such expectation with its laws, nor did the Department of Justice with its regulations. Moreover, it is unclear what the doctrine articulated in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1975), that non-policymaking employees in the Executive cannot be dismissed for purely patronage, political reasons, has to do with this case. In the view of this dissent, such an employee in the excepted service could be dismissed without a hearing and with reasons given, for unprofessional behavior. Moreover, there is nothing in the majority's analysis that limits it to Schedule A and not Schedule C members of the excepted service. Therefore it is unclear what, if anything, the majority intends to make of this distinction.

In this case, it is my view that the clear exceptions to the usual civil service procedural protections, and Congress' sound policy reasons for making some Executive jobs at will, justify limiting any expectation a person could have in employment in the Justice Department. Any such expectation must be conditioned on the ability of the appropriate official to fire the employee at any time, for any reason, without a hearing.

separation of powers provides the answer to this. The courts are extremely deferential to Congress and the Executive, the political branches, when separation of powers considerations are involved. That is the heart of the political question doctrine as expounded in *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962): "Prominent on the surface of any case held to involve a political question is found [various factors or] ... the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government..."

So the court should defer here to Congress' judgment that liberty interests—which do require some statutory support—should not be deemed to vest in certain jobs in the Executive. This court should not erase the line Congress has drawn between the excepted and competitive services, nor try to move it. Because of the separation of powers interests involved, that congressional line drawing should be both permitted and deferred to.

If cases such as *Vitek, supra,* which deal with state law, follow the analysis they do partly out of deference to the states and their primary responsibility in our federal system for criminal law and procedure, then Congress should be afforded at least as much deference in its role as the primary guardian of the separation of powers. In *Bush v. Lucas*, 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983), for example, the Court deferred to Congress' primary responsibility to regulate the Civil Service in a similar manner. In *Bush,* an engineer employed by the National Aeronautics and Space Administration (NASA) was demoted for making statements to the press critical of NASA. While his administrative appeal was pending, he sued NASA for damages for violation of his constitutional rights under the First Amendment. The Fifth Circuit held, and ultimately the Supreme Court agreed, that the plaintiff had no cause of action under the First Amendment for retaliatory demotion in view of the available remedies under the Civil Service Commission regulations. The relationship between the federal government and its civil service employees was a special factor counselling against the judicial recognition of a damages remedy under the Constitution. This was so, notwithstanding the assumption that administrative remedies were *not* adequate to fully compensate the plaintiff for harms suffered. *Id.* at 1120.

The Court's deference to Congress' expertise in this area should not be taken merely as an acknowledgement of Congress' experience and access to information, but as a recognition of Congress' constitutional role in preserving the separation of powers. Writing for a unanimous court, Justice Stevens reasoned in *Bush v. Lucas* that given the existence of a long history of congressional development of Civil Service remedies and the comprehensive nature of those remedies, the Court should hesitate before it augmented those remedies with a new constitutional tort right of action. The crucial point that a correct analysis of the present case would have to bear in mind is that when Congress created *exceptions* to the competitive service remedies, it was acting on policy considerations, namely separation of powers and the autonomy of certain parts of the Executive Branch, of importance equal to or even greater than those which prompted its creation of those remedies in the first place. These congressional determinations must receive as much deference as its determination to provide an alternative remedy. *See id.* at 1124. If one denies this premise, then one is thrust into the dismaying position outlined above, pp. 1122–24, that it is impossible for Congress to create truly at will government positions, an argument that entails bad policy results and is ultimately incompatable with *Paul v. Davis.*

The majority opinion states that its decision "does not *in any way* implicate or constrain the executive's plenary power to remove policy-making executive appointees" and asserts that "the executive's removal power is governed by the appointments clause and its surrounding jurisprudence." Maj. Op. at 1107 n. 14. For this construction and limitation of Executive

power three cases are cited. One involves the removal of a postmaster, confirmed by the Senate, whose removal that body unsuccessfully sought to prevent with the claim that the statute also required Senate consent for removal, *Myers v. United States*, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926); one involves an appointment confirmed by "the quasi-legislative and quasi-judicial" Federal Trade Commission, *Humphrey's Executor v. United States*, 295 U.S. 602, 608, 55 S.Ct. 869, 79 L.Ed. 1611 (1935); and one involves the "quasi-judicial" War Claims Commission, *Wiener v. United States*, 357 U.S. 349, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1958).

It is difficult to understand the exact limitation on the application of its analysis for which the majority cites these cases. The only common element in the cases is that the officials in each were appointed and confirmed by the Senate, but the constitutional requirement of the President as head of the Executive Branch of the government that "he shall take care that the laws be faithfully executed ..." does not restrict him to faithfully executing the laws with officers confirmed by the Senate. The Constitution recognizes that "the Congress may by law vest the appointment of ... inferior officers ... in the President alone ... or in the Heads of Departments." [9] This the Congress has done, and hordes of policy-making officers are appointed without Senate confirmation—they are in fact the principal sources of executing federal laws—and there is no more important body of inferior officers engaged in supervising the faithful execution of the laws than the lawyers in the Department of Justice who directly execute laws in the field. As for them, and all other inferior officers in the Justice Department, removal of executive officials from office is an executive function; the power to remove, like the power to appoint, is part of "the Executive power," a conclusion which is confirmed by the obligation "to take care that the laws be faithfully executed." *Myers v. United States*, 272 U.S. 52, 161, 164, 47 S.Ct. 21, 40, 41, 71 L.Ed. 160 (1926).

It may be that the majority's decision conflicts with the Executive's prerogatives as established by the appointments clause jurisprudence as well as Congress' power to protect certain officials against at will removal. While it may show they are "at a loss to understand" the separation of powers argument made herein, the majority's cryptic reference to the appointments clause does not begin to rebut it.

At the very least, the majority should have undertaken for the excepted service the same analysis of the legislative history that Justice Stevens does for the competitive service in *Bush v. Lucas*, 103 S.Ct. at 13–21. Without such an inquiry, the majority cannot be confident that its decision is not flying in the face of the policies Congress intended to advance by creating the exceptions to the competitive Civil Service remedies. And if the Court reasoned, unanimously, that those policies deserved to be deferred to, notwithstanding the fact that a *Bivens* action would have lain had there been no such policy, then it follows that an equally important policy, albeit expressed by exceptions, also deserves to be deferred to. It is irrelevant that in one case the congressional policy preempts a *Bivens* action, and in this case it should preempt a due process claim. The policies of Congress are not addressed, let alone deferred to, by the majority. In my opinion the correct disposition of this case would find that Congress never intended to lay the basis for liberty interests in employment in the excepted service and so a member of such a service, such as Jane Doe, could not bring the action the court here recognizes.[10]

---

**9.** U.S. Const. art. II, § 2 provides:
"[The President] shall have power ... [to] nominate, by and with the advice and consent of the Senate, ... all ... officers of the United States, whose appointments are not herein otherwise provided for, and which shall be established by law ... but the Congress may by law vest the appointment of such inferior officers as they think proper, in the President alone ... or in the heads of departments."

**10.** This circuit has not previously committed itself to the application of *Paul v. Davis* that the majority follows. In *Mosrie v. Barry*, 718 F.2d

## IV.

The presence of these important constitutional separation of powers issues in our case is alone enough to distinguish it from those on which the majority relies. *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1979), for example, dealt with the relationship of the City Manager of the town of Independence, Missouri with the local police chief. By contrast, this case deals ultimately with the relationship of the President of the United States and the Attorney General to the most powerful and selective law enforcement agency in the world, the Department of Justice, not to mention the rest of the excepted service. In my opinion, this court should pause before it blithely applies to the government of the United States an analysis used in a case involving a local municipal government.

The majority, however, apparently wishes us to ignore the analysis of *Paul v. Davis* because of a footnote in *Owen*, 445 U.S. at 633 n. 13, 100 S.Ct. at 1406 n. 13, and other circuit court cases. *See* Maj.Op. at 1107. Ordinarily, one does not have to go to the footnotes to figure out the holdings of cases. But even if we do, we find the liberty issue Justice Brennan is referring to is that raised on pages 45 and 46 of the Respondent's Brief in *Owen*. Consulting that brief one finds there is no discussion at all of whether an at will city

1151, 1161 (1983), Judge Bork writing for the Court said

> For a defamation to give rise to a right to procedural due process, it is necessary—*we need not say when it is sufficient*—that the defamation be accompanied by a discharge from government employment or at least a demotion in rank and pay. The latter, more general category requires that the government either have formally deprived one of a legal right, such as the right to purchase liquor or to drive, or have so severely impaired one's ability to take advantage of a legal right, such as a right to be considered for government contracts or employment or a right to seek non-government employment,[8] that the government can be said to have "foreclosed" one's ability to take advantage of it and thus extinguish the right.
>
> [8] *Of course, we assume nothing about what such rights can be found in federal or in state law.* (Emphasis added.)

The qualifiers emphasized above in Judge Bork's analysis, especially coming as they do after a thorough and accurate presentation of the law in *Paul v. Davis,* far from supporting the majority's opinion, actually cast doubt upon it. These qualifiers say precisely, first, that the court is not taking a position on whether defamation accompanied by a discharge from government employment is *sufficient* to give rise to a procedural due process claim, and second, that it is not taking the position that foreclosure from future government or non-government employment is a right which can in fact be found generally and across the board, for every case, in federal or state law. *Mosrie* therefore deliberately leaves open the question this court now addresses.

*Conset Corp. v. Community Services Administration,* 655 F.2d 1291 (D.C.Cir.1981) and *Old Dominion Dairy Products v. Secretary of Defense,* 631 F.2d 953 (D.C.Cir.1980) are both government contracting cases. Contracting with the Department of Defense is regulated by the extremely complex and detailed Defense Acquisition Regulation (DAR), 32 C.F.R. Vols. I–III (1979) that provides, *inter alia,* for grounds upon which a contract may be terminated. *See* DAR 1–903.1 (32 C.F.R. 1–903.1). This is a case where the federal government creates liberty interests in contracting, much as a state may in parole, by setting up an elaborate statutory and regulatory system that provides for some interest, generates expectations concerning it, and governs it with law. *Old Dominion* can be seen therefore as holding, quite analogously to *Vitek, supra,* that once the state creates these liberty interests, grounded on the expectations created by establishing a legal framework, it must accord those interests due process protection. Similarly, in *Conset Corp. v. Community Services Administration,* 655 F.2d 1291 (1981), there would have been no interest that required due process protection but for the statutes and regulations establishing and controlling the Community Service Administration, and the contracts and grants made pursuant to them. Had Congress expressly provided for the CSA to be able to revoke grants and contracts at any time, for any reason, then this case might be analogous. As it is, it is not. Moreover, it does not raise the separation of powers questions at issue in our case.

It can be conceded, moreover, that the dictum in *Codd v. Velger,* 429 U.S. 624, 627, 97 S.Ct. 882, 884, 51 L.Ed.2d 92 (1977) makes a point similar to that deduced from footnote 13 in *Owen.* But *Codd,* like *Owen,* is about a non-tenured *city* employee, so the separation of powers problems were not raised before let alone addressed by the Court. Therefore it is unnecessary and ill-advised to take the dictum from *Codd* and extend it to federal employees in the excepted service. *See supra* at 1122.

government employee has suffered a harm to a liberty interest by being dismissed amidst reputation-damaging allegations, notwithstanding the fact that he was entitled to no procedural protections from dismissal under city ordinances. The issue there was whether any causal connection existed, and whether a causal connection had to exist, between the city manager's dismissal of the plaintiff and the city council's issuing reports one week later that damaged his reputation. Did the reputation-damaging remarks occur in the course of termination, as *Board of Regents v. Roth*, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1974), seems to require? This is a good question, and the district court might have had to grapple with it on remand if, as the partial dissent suggests, it had read the appellant's complaint that the Justice Department issued reputation damaging reports "upon her removal" to mean that it issued them almost two years after her removal, thus avoiding the bar imposed by the statute of limitation. However, it would take even more stretching to say that on the basis of this footnote one should, in effect, reject the majority analysis in *Paul v. Davis* and adopt that of its dissent.

At this point Justice Rehnquist's and Justice Brennan's views in *Paul v. Davis* should be contrasted to support the analysis herein that the majority in *Paul* explains the outcome of the majority opinion in this case less than does the dissent in *Paul*. The former has already been set out in some detail. The latter can be briefly put. Justice Brennan essentially claims that "... [The Fourteenth] Amendment, which is only designed to prohibit 'state' action, clearly renders unconstitutional actions taken by state officials that would merely be criminal or tortious if engaged in by those acting in their private capacities." 424 U.S. at 716, 96 S.Ct. at 1167. Thus Justice Brennan would have ruled that the defamation of a private individual by the government, as in *Paul*, violated that citizen's liberty interest in reputation. The due process clause protects individuals against such government torts and crimes, in Justice Brennan's view. It is fair to say that Justice Brennan does not view these crimes and torts as limited to those defined by the common and statutory law of any particular state. Indeed, it is unclear that a state's law of torts or crimes is relevant at all, in Justice Brennan's view, to the constitutional inquiry. *Id.* at 715, 96 S.Ct. at 1167. As one reflects on this reading of the due process clause one cannot avoid the conclusion that whatever it may be, it is certainly not cramped. Under Justice Brennan's dissenting view, it is the state action element that turns what would otherwise be the tort of defamation into a violation of a liberty interest. This is really the view the majority here adopts.

*Paul v. Davis*, however, *holds* that if the state just defames a person, that person has not had her liberty interest violated. And under *Board of Regents v. Roth, supra*, moreover, if the state just fires a person (or declines to rehire him) he has not had his liberty interest violated, unless he had a *protected* interest in his job. But, in the view adopted by the majority, if the state does *both* things to an individual (either at the same time or perhaps within one or two years of each other), then that person's liberty interest (in reputation) has been violated. This seems odd. The majority has pointed to dicta in cases in this circuit that do indeed suggest this view. This view cannot be reconciled, however, with the majority position of the Court in *Paul v. Davis*. What can be said is that the law the majority would apply here amounts to holding that when a state or federal government commits the tort of defamation against someone, that *does* violate the liberty interest in reputation, as Justice Brennan argued. The "plus" requirement in the "reputation plus" test then becomes no more than a prefunctory bow towards *Paul* and *Roth*, as if what

those cases really stand for is an arbitrary decision to apply Justice Brennan's analysis only to the government employment context.

To put this point another way: What is the principled reason for applying the view that defamation by the state violates a liberty interest, but only in the context of termination from government employment? There may be a rationale for this limitation that is consistent with the Court's opinion in *Paul v. Davis,* but I have not been able to find it.[11] If one does exist, it should be in the majority's opinion, but it is not. The only other explanation for the straight "reputation plus" test I can think of is that holding any government job creates *ipso facto* some sort of property right that for some reason is necessary before one can assert a liberty interest. But such a position, which is rather like the one the majority accuses this dissent of espousing, has nothing to be said for it. It really would rest on a misreading of *Paul.*

Thus it seems the test as currently applied in the other circuits, and about to be applied here, is merely Justice Brennan's dissent in *Paul* arbitrarily limited to the context of termination from government employment. It therefore seems this view verges on seeing the "plus" requirement in the "reputation plus" test for a liberty interest to exist as just an unprincipled and unfortunate obstacle in the way of a more general application of Justice Brennan's theory of the due process clause. Because in my view that theory lacks any *compelling* precedential support, because it flies in the face of the text and history of the Clause and because it represents merely an attempt to circumvent the clear meaning of *Paul v. Davis,* I decline now to embrace it.[12] Therefore I respectfully dissent.

11. Unless, of course, state or federal law creates liberty interest expectations by establishing procedural protections. That is not the federal at will employment case.

12. In taking this step, moreover, the majority proceeds without even the full benefit of our adversarial system of adjudication. As Judge Scalia recently wrote in a closely related case, "[t]he premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." *Carducci v. Regan,* 714 F.2d 171, 177 (D.C.Cir.1983). *See also Bartel v. F.A.A.,* 725 F.2d 1403, 1415 n. 21 (D.C.Cir.1984). In *Carducci* the court decided not to reach the question of whether the entitlements of the Civil Service Reform Act were the exclusive body of status and tenure protections accorded to federal employees in the competitive service which defined the scope of any property interests. It was a question "of first impression ... and major importance" to all employees in the competitive service, just as this case is to the excepted service. In the present case the court extends due process protection to all employees in the excepted services, a course with important consequences to the separation of powers and the efficient execution of the duties of the Executive Branch, without the substantial assistance of briefing on these points. The due process question has been briefed and argued, but not as fully as it should be, given the importance of this case. This unfortunate circumstance arises because the court raised the due process claim *sua sponte* by reconstructing the appellant's complaint in the course of reviewing the district court's Fed.R. Civ.P. 12(b)(6) dismissal of the original, flawed pleading. Thus the court reaches an important constitutional question without a fully adequate consideration in an adversarial context.